Corrected

2021 IL App (1st) 210098-U

SECOND DIVISION
September 14, 2021

No. 1-21-0098

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF J.B., | ) | |
| | ) | Appeal from the |
| Minor-Respondent-Appellee | ) | Circuit Court of |
| | ) | Cook County |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Child Protection Division |
| | ) | |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 19 JA 195 |
| | ) | |
| TIA J.-T., | ) | Honorable |
| | ) | Kimberley D. Lewis, |
| Mother-Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:  The juvenile court's adjudication and disposition orders are affirmed where the evidence presented at each hearing was not against the manifest weight of the evidence. The respondent failed to establish that she was denied her right to effective representation of counsel at the adjudicatory hearing pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 2    This cause of action arises from the State's petition for adjudication of wardship of the

minor, J.B.   The respondent-appellant, Tia J.-T. (hereinafter the respondent) is the biological mother of J.B. The identity and whereabouts of the minor's father are unknown. At the adjudicatory hearing, the juvenile court adjudicated J.B. neglected by being exposed to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)). At the subsequent disposition hearing, the court further determined that both the respondent, and the minor's unknown biological father, were unable for some reason other than financial circumstances to care for J.B., and adjudged J.B. a ward of the State, placing her in the custody/guardianship of the Department of Children and Family Services (DCFS).  This appeal is made solely by the respondent. She challenges both the adjudicatory and disposition findings made by the juvenile court. In addition, she argues that she was denied her right to effective representation during the adjudicatory hearing.  The State and J.B.'s public guardian have filed appellee's briefs. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      J.B. is a girl who was born on February 13, 2019.  Only a few weeks after her birth, on March 1, 2019, the State filed a petition for adjudication of wardship, alleging that J.B. was neglected because her environment was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2018)) and abused because she was at a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2018)).  As a factual basis the petition alleged the following:

> "[The respondent] has two other minors in the custody of DCFS with findings of neglect having been entered. [The respondent] has been diagnosed with bipolar disorder and has been psychiatrically hospitalized on multiple occasions for suicidal ideation. [The respondent] has yet to engage in mental health treatment and reunification services are outstanding. [The respondent] has yet to resume psychotropic medication since [J.B.'s] birth. [The respondent] has failed to make herself and [J.B.] available for assessment by

2

the Department. [J.B.'s] whereabouts are unknown."

As a result, the State sought temporary custody of J.B.

¶ 5     The respondent was notified of the petition and asked to appear before the juvenile court for a temporary custody hearing.  The respondent, however, failed to appear or produce J.B. The hearing therefore proceeded in the respondent's absence. Based on the facts set forth in the State's petition, the juvenile court found probable cause that J.B. had been neglected. The court also found urgent and immediate necessity to remove J.B. from the respondent's care, placed J.B. in temporary custody of DCFS and issued a child protection warrant for her. On March 7, 2019, the respondent appeared in court with J.B. and a staff member from the National Youth Advocate Program (NYAP). The juvenile court appointed a bar attorney to represent the respondent and a separate bar attorney to serve as J.B.'s attorney and guardian *ad litem* (hereinafter GAL).  DCFS officials then removed J.B. from the respondent's care and placed her in a foster home with a caregiver identified as her fictive kin.

¶ 6     On November 20, 2019, the court held an adjudicatory hearing on the State's petition.  The State initially offered into evidence the following exhibits: (1) the juvenile court's adjudication and disposition orders regarding J.B.'s two older siblings, T.M. and K.B.; and (2) the respondent's certified and delegated Jackson Park hospital and Roseland Community hospital medical records. The following relevant facts were adduced from this documentary evidence.

¶ 7     The July 11, 2018, adjudication orders for T.M. and K.B. found both minors were neglected because they were exposed to an injurious environment while in the care of the respondent. The subsequent November 30, 2018, disposition orders found that the respondent was unable for reasons other than financial circumstances to care for T.M. and K.B. and adjudged them both wards of the court. In admitting this evidence at J.B.'s adjudicatory hearing, the juvenile court took

judicial notice of the stipulation of the certified and delegated records from Mt. Sinai hospital, which served as the evidentiary basis of T.M.'s and K.B.'s neglect findings. This evidence, which is contained in the juvenile court records for T.M. and K.B. (case Nos. 18 JA 18, and 18 JA 19), however, is not part of this record on appeal.

¶ 8    The respondent's medical records from Jackson Park hospital revealed that on May 10, 2019, the respondent was brought to the emergency room by police officers after exhibiting psychotic symptoms including agitation, aggression, and erratic behavior. Upon admission, the respondent also tested positive for marijuana. The respondent could not calm down and needed to be chemically sedated. After she was sedated, she indicated that she had gone to J.B.'s foster parent's home attempting to speak to J.B., after which the foster parents called the police. The respondent told hospital staff that she had concerns that her child was being abused.

¶ 9    The respondent was admitted to the hospital and evaluated by a psychiatrist the following day, who diagnosed her with bipolar disorder. The psychiatrist noted that the respondent had a history of "chronic mental illness," was not compliant with her psychotropic medication, and was unable to understand her need for treatment and medication, and the "severity of her illness." The psychiatrist also believed that the respondent was "manipulative" and "dramatic." The respondent was prescribed a medication regiment and a series of short-term goals and remained hospitalized for five days upon which she was stabilized and released.

¶ 10    In addition to her May 2019 hospitalization, the Jackson Park hospital medical records described three of the respondent's prior hospitalizations. First, in July 2017, the respondent, who was twelve weeks pregnant with one of J.B.'s siblings, was treated for injuries she sustained following a physical altercation with her boyfriend, who had beat her on her back and legs. Two months later, in August 2017, the respondent was admitted to Jackson Park hospital with

complaints of feeling depressed and having no place to live. At this time, she admitted that she was "smoking two blunts a day" and that she had not yet seen an obstetrician or had an ultrasound even though she was 16 weeks pregnant. In February 2018, the respondent was hospitalized again following complaints of depression and suicidal ideation. She was placed on suicide precaution until stabilized with psychotropic medication.

¶ 11    The respondent's medical records from Roseland Community hospital described her labor and delivery of J.B. According to these records, a lab tests taken upon the respondent's admission to the delivery ward on February 13, 2019, indicated that the respondent tested positive for marijuana. The nurse's notes of February 15, two days upon J.B.'s delivery, however, showed that the respondent was breastfeeding J.B. and bonding with her.

¶ 12    After the admission of the State's exhibits at the adjudicatory hearing, the State called its sole witness, caseworker Priscilla Herring of Unity Parenting and Counseling Inc. (Unity). Herring testified that she was assigned to supervise T.M. and K.B.'s DCFS case from February 2018 to October 2019. Herring testified that during the respondent was required to complete a series of services addressing the risk factors that had contributed to T.M.'s and K.B.'s neglect so that the two minors could safely be returned to her care. These services included: a psychological assessment, a psychiatric assessment, a domestic violence assessment, trauma-informed individual therapy, parenting classes, parent coaching, parent-child psychotherapy, substance abuse treatment and supervised visitation with T.M. and K.B.

¶ 13    Herring made each of the recommended services available to the respondent. She testified that she arranged a psychological evaluation for the respondent, but the respondent failed to attend the scheduled evaluation appointments three times. Herring also referred the respondent for individual therapy, a domestic violence assessment, and parenting classes, but the respondent

5

failed to participate in any of these services. When Herring tried to refer the respondent for a psychiatric evaluation, the respondent informed her that she already had a psychiatrist. Herring then asked the respondent to sign a consent form releasing her mental health information to Unity so that Herring could communicate with the respondent's psychiatrist, obtain information regarding her mental health, and confirm that the respondent's treatment met the requirements of the DCFS service plan. According to Herring, however, the respondent refused, informed Herring she did not want "any services from [Unity,]" and asked Herring not to refer her for any additional reunification services.

¶ 14    Herring also averred that the respondent's drug of choice was marijuana. She admitted that the respondent had told her that in May 2018, she was engaged in a substance abuse treatment at Southwood Interventions and that she was attending a residential program at Women's Treatment Center. Herring averred, however, that the respondent never provided her with any documentation of these services.

¶ 15    Herring next testified that when DCFS took protective custody of J.B. in March 2019, the respondent had not completed any of the recommended reunification services for T.M. and K.B. In addition, the respondent's supervised visits with these two older children had only been sporadic.

¶ 16    Herring's next testified regarding J.B. She explained that her primary concern with J.B.'s birth was the respondent's mental health. As Herring explained, the respondent's mood constantly fluctuated with frequent outbursts of anger, yelling, and screaming. In addition, the respondent was not taking her prescribed psychotropic medication, and had informed Herring that her obstetrician had advised her against taking such drugs while pregnant. In addition, the respondent refused to meet with a DCFS investigator when J.B. was born and denied DCFS consent to the

release of her psychiatric information.

¶ 17    After the State's case-in-chief, the respondent testified on her own behalf. She stated that between February 2018 and March 2018, she participated in individual therapy with a therapist, named "Jason" at Mt. Sinai Hospital. The respondent acknowledged that her therapist was not aware of her DCFS treatment goals but stated that she talked to him about T.M. and K.B. being removed from her care. The respondent also testified that she spoke to the therapist about her own life as a ward in DCFS custody and her experiences of abuse while in the care of her adoptive mother, which had prompted her fears for her own children, who she believed had been placed in the custody of the same person. The respondent acknowledged that she stopped therapy after about a month and as soon as she was prescribed psychotropic medication.

¶ 18    The respondent also testified that in June 2018, she completed a psychiatric evaluation through Unity, which recommended that she receive individual therapy and medication monitoring. She stated that afterwards, she was prescribed Fluoxetine, and received medication monitoring through psychiatrist, Dr. Michael Grover, at Mt. Sinai Hospital. The respondent averred that she was compliant with her medication.

¶ 19    The respondent next testified that in 2018, she began working with the NYAP and that this agency offered her mentoring and housing support. The respondent stated that she provided Herring with documentation of both her individual therapy at Mt. Sinai hospital and through NYAP.

¶ 20    The respondent further averred that she was capable of taking caring for J.B. and that the NYAP could provide her with any services that she needed. The respondent testified that Roseland Community hospital released J.B. into her care and that for two weeks the two of them lived together, without incident, at her boyfriend's parents' home. According to the respondent, during

these two weeks J.B. was well taken care of.

¶ 21    After the respondent's testimony, the parties proceeded with closing arguments. The State argued that the respondent's psychiatric condition, which led to neglect findings involving J.B.'s older siblings, T.M. and K.B., coupled with her noncompliance with psychotropic medication and reunification services, established that J.B. was exposed to an injurious environment while in the respondent's care. On the other hand, counsel for the respondent argued that the State's petition should be dismissed because the State had failed to establish that J.B. was neglected in the respondent's care. Counsel pointed out that the respondent had testified that she participated in some reunification services (including psychiatric treatment) before J.B. was born and that she believed she could meet J.B.'s needs. Counsel further argued that Roseland Community hospital records revealed that the hospital discharged J.B. to the respondent's care and that "there [was] no evidence that [J.B.] was not well taken care of" during that time.

¶ 22    After hearing the parties' arguments, the juvenile court adjudged J.B. neglected based on her exposure to an injurious environment.  In doing so, the court noted that it considered the adjudication and disposition findings for T.M. and K.B., as well as all the medical records admitted into evidence. The court found that the respondent had long-term and significant psychiatric impairments and that she tested positive for marijuana at the time of J.B.'s birth, indicating that she used marijuana during her pregnancy. The court acknowledged that respondent testified that she engaged in services to address her psychiatric and drug-related issues but found that Herring's testimony established that the respondent refused to sign consents relative to those services. The court found that the respondent's refusal to consent to the release of this information prevented DCFS and the juvenile court from having "any sort of assessment as to where [respondent] was in terms of those services [or] what kind of progress she had made during those services." The court

accordingly held that the State had met its burden of establishing that J.B. was neglected based on her exposure to an environment injurious to her welfare.

¶ 23    On October 10, 2020, the juvenile court commenced the disposition hearing. During this hearing, the respondent represented herself with the assistance of newly appointed "stand-by" counsel.[1]

¶ 24    At the outset of this hearing, the State offered four exhibits into evidence: (1) the April 17, 2019, DCFS Integrated Assessment report (IA) for J.B.'s family; (2) a July 22, 2020, service plan outlining the respondent's participation in reunification services; (3) the respondent's September 21, 2020, discharge report from Howard Counseling Services (HCS); and (4) an October 5, 2020, letter from Unity's program supervisor to J.B.'s GAL.

¶ 25    The IA is a comprehensive report which discusses, among other things, the respondent's childhood, her mental health condition, and the services she needed to complete before J.B. could be safely returned to her care. The respondent was not interviewed in April 2019, when the IA was completed. Rather, the IA was compiled from historical documents (including previous interviews of the respondent) and the case record obtained from the Statewide Automated Child Welfare Information System (SACWIS).

¶ 26    According to the IA, the respondent was born on November 8, 1995. She came into DCFS custody when she was six months old because of her own mother's severe and prolonged issues with drug abuse and bipolar disorder. Unity was the social service agency assigned to service the respondent's DCFS case. While in DCFS care, the respondent and her siblings were placed with a relative caregiver, Paula F. After years of DCFS involvement, the respondent's mother voluntarily

---

[1] The respondent's originally appointed counsel withdrew on December 19, 2019. No reason for the withdrawal is apparent from the record.

terminated her parental rights and Paula F. adopted the respondent in June 2004.

¶ 27     According to the IA, the respondent reported that her childhood in Paula's home was "chaotic." The respondent raised herself, while Paula was often out gambling. In addition, the respondent began experiencing sexual abuse in Paula's home when she was a toddler. The respondent was also sexually abused as an adolescent by another child in Paula's home. The respondent reported this abuse to Paula, but Paula was dismissive of the allegations and made no effort to intervene in the abuse, which continued for a year.

¶ 28     According to the IA, the respondent was also exposed to significant community violence as a child. When the respondent was ten years old, her very close cousin was shot and killed, and her brother was battered with a baseball bat.

¶ 29     The respondent furhter reported that she attempted suicide twice and engaged in cutting behaviors when she was 12 years old.

¶ 30     When she was 13 years old, the respondent stabbed Paula's boyfriend with a fork because he refused to let her go outside. Shortly thereafter, the respondent was diagnosed with bipolar disorder. According to the respondent, this prompted Paula to learn that she could get more money for her adopted children if they had special needs, so she began putting all of them on psychotropic medication.

¶ 31     Later that year, the respondent was psychiatrically hospitalized for making threatening statements to Paula. At that point, the respondent returned to DCFS custody because Paula refused to allow her to return to her home.

¶ 32     According to the IA, at the age of 14, the respondent experienced domestic violence from her then 24-year-old boyfriend, who physically assaulted her and forced her to perform sexual acts.

The respondent was impregnated but had a miscarriage.

¶ 33    At the age of 15, the responded was arrested for robbing and assaulting a disabled child. That same year, she was psychiatrically hospitalized for several months at Hargrove Hospital after threatening to burn down her foster parent's home. The respondent refused psychotropic medication and attacked two staff members while at Hartgrove, requiring the use of full restraints. During this hospitalization, the respondent's new boyfriend, with whom she had a positive experience, was shot in the head, and killed.

¶ 34    After being discharged from Hartgrove, the respondent was briefly housed at the Allendale Residential Facility but left because she did not like the rules there.  When leaving the facility, the respondent reported that everything in her memory "went black."  She woke up the following day at her brother's girlfriend's home without any memory of the previous day.

¶ 35    To avoid further foster placement disruptions, at this point, DCFS provided the respondent with her own apartment until she could age out of the foster care system. The respondent had to leave two of these apartments because she did not follow the rules or treat the spaces with respect.

¶ 36    According to the IA, the respondent had her first child, T.M., in November 2013, just before her eighteenth birthday. After her emancipation, the respondent experienced "chronic housing instability" and reported that it was hard for her to find a place for her son, T.M. to live.

¶ 37    In August 2014, DCFS investigated the respondent's care of T.M. after the respondent was observed telling T.M. who was then one years old, "shut the f*** up. I'm gonna punch you in your face if you don't shut up. Wait until we get out of the car, I'm going to punch you in your f****** face."  At that time, the respondent reported that T.M. was an "easy baby," and recalled waking up late to find T.M., who was two-years-old, cooking himself a hotdog on the stove.  The respondent also dismissed T.M.'s serious speech impediment as his "normal talk," and stated that

she had a hard time potty training him because she is not male.

¶ 38    According to the IA, when the respondent turned 19, she began dating a man who used drugs and physically abused her.  On one occasion, this boyfriend punched her with such force that it broke her jawbone, requiring surgery and the placement of a metal plate.

¶ 39    The respondent met her current boyfriend, James B., in 2014.  The respondent reported that James B. has "popped" and "punched' her, but that this is "nothing bad."  She also reported that she has learned through her romantic relationships that she "must hit them before they hit her."

¶ 40    According to the IA, the respondent gave birth to her second child, a daughter, K.B. in December 2017.  The respondent reported that someone had told her during this pregnancy that she should drink red wine.  Accordingly, when she was 28 weeks pregnant, the respondent drank an entire bottle of wine, which resulted in her hospitalization for early contractions.  Subsequently, at 35 weeks pregnant, the respondent successfully induced labor by ingesting castor oil.  K.B. was born premature and tested positive for marijuana at birth.  The respondent was upset that the medical providers who delivered K.B. contacted DCFS, insisting that 35-weeks was not premature.

¶ 41    According to the IA, the respondent gave birth to her third child, J.B. on February 13, 2019. Two weeks after her birth, J.B. was taken into DCFS custody and placed in the home of a caregiver identified as the respondent's fictive kin, where she remained in April 2019 when the IA was completed.

¶ 42    According to the IA, the respondent has supervised visitation with J.B. three times a week and has regularly attended these visits. However, the respondent has reported that she fears the fictive kin's home is not safe for J.B. The IA agrees with the respondent and questions the appropriateness of the fictive kin caregiver. Specifically, the IA notes that the fictive kin planned to use Paula F. as a childcare provider, when she started work, despite a DCFS restriction that

prohibits Paula from having any more children in her care. The IA also found that J.B. "had delays in multiple domains," and noted that the fictive kin had not been practicing "tummy time" with J.B., who spent most of her day in a bouncy seat.

¶ 43    The IA further discusses the respondent's work history prior to J.B.'s birth.  According to the report, the respondent has had several "temp" jobs but none of them have lasted more than a day. In this respect, the respondent has reported that she went to these jobs under the influence of marijuana which made her "lazy." The respondent has stated that since her emancipation she has supported herself by exchanging counterfeit money for real money. The respondent averred that she earned thousands of dollars through this fraudulent scheme until she was arrested in May 2017.

¶ 44    The IA also discusses the respondent's marijuana use. The respondent began using marijuana at the age of twelve. The respondent reported that she continues to use marijuana daily because, absent this use, she loses her appetite and will "urinate and defecate herself." Before J.B.'s birth, the respondent spent a week in a drug program at Southwood Interventions but was prematurely discharged after fighting with another resident. In October 2018, she also briefly attended a drug treatment at Women's Treatment Center but left before completing the program. The respondent reported that she does not believe that she needs drug treatment or that her drug use impacts her ability to parent.

¶ 45    The IA further makes several "clinical impressions" of the respondent.  According to the IA, the respondent's "historical and unprocessed traumatic experiences," coupled with her attitudes, poor relationships, and parenting style shows that she lacks "the capacity to manage her emotional responses," which "places her children at significant risk either to direct physical harm or to witnessing frightening interactions between her and others[.]" The IA also states that the respondent appears to use marijuana as a form of self-medication to address her untreated mental

health symptoms. According to the report, the marijuana use further inhibits the respondent's ability to engage in "prosocial activities," like employment or locating housing and "perpetuates her feelings of hopelessness and helplessness." What is more, the respondent demonstrates "minimal insight" into how her untreated mental health, trauma symptoms, marijuana use, and poor emotional regulation, impact her children.

¶ 46    The IA therefore recommends a series of services that are "essential to a safe reunification" between the respondent and J.B. These services include: on-going trauma informed therapy, a psychiatric assessment, psychiatric medication monitoring, a psychological assessment, substance abuse treatment, domestic violence services, parenting education, parent coaching, and ongoing participating with NYAP's homeless youth mentorship and housing assistance program.

¶ 47    In making these recommendations, the IA recognizes that the respondent's traumatic childhood experiences with DCFS negatively impact her ability to see her current "DCFS involvement as a possible means of healing and support." This mistrust is heightened with the involvement of Unity as the service provider. Because the respondent has a good working relationship with NYAP, the IA recommends that the two agencies work together to coordinate services with which the respondent would be most open to engaging.

¶ 48    In addition to the IA, at the disposition hearing, the State further offered into evidence the July 22, 2020, service plan, outlining the respondent's progress in the reunification services with all three of her children. According to this service plan, since the assignment of new caseworker to the family in February 2020, the respondent has "made a complete turnaround" and begun participating in services. Specifically, the respondent began individual therapy with HCS, completed a parenting class, and started parent coaching. In addition, only four days after giving birth to J.B.'s younger sister on July 18, 2020, the respondent participated in a psychiatric

evaluation. Accordingly, the service plan noted that the respondent was making satisfactory progress towards reunification.

¶ 49    At the disposition hearing, the State further introduced into evidence the respondent's September 21, 2020, summary discharge report from HCS. According to this report, the respondent's attendance at therapy sessions was inconsistent from the beginning when "it was determined that services had to take place in the community and no longer at [the respondent's] residence due to a physical altercation during the first session with th[e] therapist present." In addition, according to the report, while the respondent engaged in the therapy sessions, she did not feel the need for services and participated primarily so that she could be reunited with her children. In this respect, the report notes that the respondent "insist[ed] that everything [wa]s fine" and did "not want to fully process her past history or current events." In addition, she did not feel she needed services and did not "understand [why the DCFS case] was open from the start or why it [wa]s still" pending. The report therefore recommended that the respondent be discharged from therapy until she could consistently attend the therapy sessions and be engaged.

¶ 50    As evidence at the disposition hearing, the State further offered an October 5, 2020, letter written by Unity's program supervisor, Kimmiata Mottley, to J.B.'s GAL. In this letter, Mottley states that the respondent has not attended a single therapy session since August 2020, that she has been noncompliant with her psychiatric medications, and that she has failed to make substantial progress towards reunification with any of her children. Accordingly, because J.B.'s older siblings, T.M. and K.B. have been in foster care for three years, Mottley advises a change in the DCFS permanency goals for these two minors, to termination of the respondent's parental rights.

¶ 51    After the introduction of its four exhibits, the State called Mottley as a witness. Mottley, however, was unprepared for the hearing and, among other things, misstated J.B.'s age. After

determining that Mottley was unprepared to testify the court continued the case to January 2020, so that Mottley could apprise herself of the casefile. The following testimony was then adduced at that second disposition hearing.

¶ 52    Mottley testified that she was assigned to supervise J.B.'s DCFS case between April 2020 to January 7, 2021. Mottley stated that since the completion of the IA report, J.B. has been removed from the care of respondent's fictive kin and placed in a traditional, licensed foster home. Mottley averred that J.B.'s new foster parent provides J.B. with "the best of care" and that J.B. has "excelled" in this foster home.[2] Mottley explained that J.B. is up to date with all her medical needs, has started talking, and is now acting like a "typical one-year-old."

¶ 53    Mottley next testified regarding the respondent's participation in services.  According to Mottley, although the respondent was referred to trauma-based individual therapy with HCS, the respondent attended only "a few sessions," made "no progress," and was eventually discharged after the therapist lost contact with her.  In addition, the respondent has yet to complete her psychological evaluation. While Mottley acknowledged that the respondent completed a parenting class in May 2020, she testified that the respondent failed to complete her parent coaching. In addition, since her unsuccessful June 2018 attendance at Women's Treatment Center, the respondent has not participated in any substance abuse programs.

¶ 54    Mottley further testified that since her involvement in the case, she has witnessed the respondent's violent outbursts on several occasions.  According to Mottley, the respondent has called and "cursed out" HCS' therapists and director.  The respondent has also informed staff members at Unity that she plans to "come to the agency and beat everyone up."  In addition, the

---

[2] During the disposition hearing, the State also called Unity social worker James Scott, who testified that he visited J.B.'s new foster home within the last 30 days and found it to be a safe and appropriate placement for J.B.

respondent has been sending J.B.'s foster parents "threatening text messages," and has repeatedly submitted false reports against them to the DCFS Hotline. Mottley further averred that the respondent has told her that she "doesn't care" if she disrupts J.B.'s foster care placement and that she will "do whatever she has to" because she does not like J.B.'s foster mother.

¶ 55 Mottley also testified that on October 11, 2020, the respondent was involved in a "stabbing incident" with her boyfriend's cousin, who now has an order of protection against her.

¶ 56 Mottley explained that because of these recent incidents, the respondent's visitation with J.B. has been suspended. The respondent has also been informed that in order to regain her right to supervised visitation, she must participate in individual therapy and provide Unity with a copy of her treatment plan so that Unity can confirm that the respondent is addressing issues related to reunification with J.B. during her therapy sessions. Since then, Unity has scheduled three separate therapy appointments for the respondent but the responded has failed to attend any.

¶ 57 Mottley testified that since the outset of the DCFS investigation, the respondent has not achieved unsupervised visitation with any of her three children.

¶ 58 Based on the aforementioned evidence, the juvenile court found that the respondent was unable for some reason other than financial circumstances to care for J.B., and adjudged J.B. a ward of the court, placing her in the custody/guardianship of DCFS. In doing so, the court found that Unity had made reasonable efforts "to prevent or eliminate removal of the minor from the home," and that "appropriate services aimed at family reunification had been unsuccessful."

¶ 59 Based on the evidence entered at the disposition hearing, the juvenile court also entered a permanency hearing goal for J.B. of return home within twelve months. The respondent now

appeals.

¶ 60                                    III. ANALYSIS

¶ 61    On appeal, the respondent makes three contentions. She asserts that the juvenile court reached improper findings both after the adjudicatory and the disposition hearings.  In addition, she asserts that she was denied effective representation of counsel during the adjudicatory proceeding.

¶ 62    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1–1 *et seq.* (West 2018)) sets forth the procedures and criteria for determining whether to remove a minor from her parents' custody and make the child a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). In making this determination, the circuit court employs a two-step process. *In re A.P.*, 2012 IL 113875, ¶ 18. First, there is an adjudicatory hearing wherein the court determines whether the minor is abused, neglected or dependent. 705 ILCS 405/2–18(1) (West 2016); *In re A.P.*, 2012 IL 113875, ¶ 19. If the court determines that the minor is abused, neglected or dependent, the court holds a disposition hearing, wherein it determines whether it is in the best interest of the minor and the public for the minor to be made a ward of the court. 705 ILCS 405/2–21(2) (West 2016); *In re A.P.*, 2012 IL 113875, ¶ 21.

¶ 63                              A. Adjudicatory Order

¶ 64    On appeal, the respondent first argues that the trial court erred in adjudging J.B. neglected where the State failed to present sufficient evidence of neglect due to an injurious environment. For the following reasons, we disagree.

¶ 65    It is axiomatic that in deciding a petition for adjudication of wardship the paramount consideration is the best interest of the child. *In re A.P.,* 2012 IL 113875, ¶ 18; see also *In re F.S.*, 347 Ill. App. 3d 55, 62 (2004). In an adjudicatory hearing, it is the State's burden to prove  neglect

by a preponderance of the evidence. *Id.*; see also *In re Arthur H.,* 212 Ill. 2d 441, 465 (2004). In other words, the State must establish that the allegations of neglect are more probably true than not. *In re Samantha C.,* 2013 IL App (1st) 131573 ¶ 31; see also *In re A.P.,* 2012 IL 113875, ¶ 17; see also *In re K.G.,* 288 Ill. App. 3d 728, 735 ("Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not").

¶ 66    "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances." *In re Arthur H.,* 212 Ill. 2d at 463; see also *In re Malik B.-N.,* 2012 IL App (1st) 121706, ¶ 35. "Because the trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses it is in the best position to determine the credibility and weight to be given to the witnesses' testimony" and is therefore afforded great deference. *In re F.S.,* 347 Ill. App. 3d 55, 62–63 (2004). A reviewing court will not disturb the trial court's findings unless they are against the manifest weight of the evidence. *In re A.P.,* 2012 IL 113875, ¶ 17; see also *In re D.S.,* 217 Ill. 2d 306 (2005). A trial court's finding is against the manifest weight of the evidence only if "the opposite conclusion is clearly evident." *In re A.P.,* 2012 IL 113875, ¶ 17 see also *In re K.G.,* 288 Ill. App. 3d at 735.

¶ 67    In the present case, the State alleged, and the court found by a preponderance of the evidence, that J.B. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (Act), based on an environment injurious to her welfare. 705 ILCS 405/2-1(1)(b) (West 2018) (defining a neglected minor as "any minor under 18 years of age whose environment is injurious to his or her welfare.") Generally, neglect is defined as a failure to exercise that care that " 'circumstances justly demand' " and includes both willful and unintentional disregard of parental duties. *F.S.*, 347 Ill. App. 3d at 67 (quoting *In re S.D.*, 220 Ill. App. 3d 498, 502 (1991)). By contrast, an injurious environment is an amorphous concept that cannot be defined with specificity. *Id*. Rather, each

case must be reviewed on its own specific circumstances. *Id.*

¶ 68 In the present case, in finding J.B. was neglected by exposure to an injurious environment, the juvenile court relied primarily on the respondent's severe and untreated mental illness, which required numerous hospitalizations, and was compounded by her continued marijuana use, and her prior experiences with domestic violence and homelessness. In addition, the court relied on the prior adjudications of neglect by exposure to an injurious environment of J.B.'s two older siblings, T.M. and K.B., and the respondent's repeated noncompliance with all recommended reunification services for these two children offered to her through Unity. Based on this reasoning, we find nothing manifestly erroneous in the juvenile court's conclusion that J.B. was exposed to an injurious environment. See *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 45 (finding that a respondent's "poor decision making, coupled with her consistent failure to participate in services as assigned to her, sufficiently" supported the trial court's finding that her daughter was neglected due to an injurious environment.).

¶ 69 The respondent nevertheless contends that the finding of neglect is against the manifest weight of the evidence because under the theory of anticipatory neglect the State failed to establish that the respondent's prior actions with respect to J.B.'s older siblings had any relationship to the condition and care that the respondent provided J.B. in the first two weeks of her life. Moreover, the respondent contends that the State failed to establish a nexus between her mental illness and her ability to care for J.B. We disagree.

¶ 70 Under the theory of "anticipatory neglect" the State may seek protection of children who have "a probability to be subject to neglect or abuse because they reside, or in the future may reside with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). The doctrine of anticipatory neglect recognizes that a parent's

20

treatment of one child is probative of how that parent may treat his or her other children. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 30 (citing *In re Erin A.,* 2012 IL App (1st) 120050, ¶ 34). Nevertheless, "there is no per se rule that neglect or abuse of one child conclusively establishes, or does not establish, the neglect of another child." *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34. Rather, in applying the doctrine the court is required to consider "the current care and condition of the child in question" as well as "the circumstances that existed at the time of the incident involving the child's sibling." (Internal quotation marks and citations omitted.) *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 44.

¶ 71    In the present case, contrary to the respondent's position, the State's case was not exclusively premised on the theory of anticipatory neglect.  While the State offered T.M.'s and K.B.'s adjudications of neglect into evidence, its allegations regarding J.B.'s neglect based on an injurious environment were further premised on the respondent's actions at the time of J.B.'s birth, specifically, the respondent's untreated and severe mental illness, her repeated noncompliance with reunification services and her drug use.

¶ 72    In this respect, medical records from Jackson Park hospital introduced at the adjudicatory hearing unequivocally established that the respondent had a long history of severe, chronic, mental illness, including bi-polar disorder, and that she was not compliant with her psychotropic medication at the time that J.B. was removed from her care. These medical records state that the respondent was unable to understand her need for treatment, her need for medication, or the severity of her illness.  They further establish that the respondent's mental illness had previously caused her to behave in a labile, combative, and aggressive manner, as well to suffer from depression, including suicidal ideation.

¶ 73    In addition, medical records from Roseland Community hospital established that the

respondent tested positive for marijuana on the date she gave birth to J.B.

¶ 74    Consistent with these medical records, Unity caseworker Herring testified that in her interactions with the respondent, the respondent exhibited mood fluctuations and angry outbursts, which were symptomatic of her mental illness, and that marijuana was her drug of choice.

¶ 75    Moreover, the testimony at the adjudicatory hearing established that the respondent was assessed as needing and offered numerous services related to her mental illness and drug use but remained noncompliant with all services at the time J.B. was born. In this respect, Herring testified that she had assessed the respondent needing, *inter alia*: trauma-informed individual therapy; substance abuse treatment; a psychiatric assessment; a psychological assessment; child-parent psychotherapy; and domestic violence services. According to Herring, despite her repeated efforts to provide these services to the respondent, the respondent failed to partake in a single service offered to her through Unity. Herring further averred that although she accommodated the respondent's request to work with her own mental health providers, the respondent repeatedly refused to allow DCFS access to her mental health information to confirm that her alleged treatment satisfied the requirements of her DCFS service plan. In addition, the respondent failed to produce documentation showing her participation in any services outside of Unity.

¶ 76    Where the petitioner's severe mental illness continued to be untreated at the time of J.B.'s birth, she continued to abuse marijuana, and refused to partake in any social services offered to her to address the issues arising from this illness, or provide the agency with consents and/or documentation regarding outside services, we find that there was sufficient evidence for the juvenile court's finding of neglect based on an injurious environment. Accordingly, we have no basis to find that the opposite conclusion of that reached by the juvenile court is clearly evident. See *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 45.

¶ 77                    B.  Ineffective Assistance of Counsel

¶ 78    On appeal, the respondent nevertheless contends that we must reverse the adjudicatory order because she was denied her right to effective representation of counsel at the adjudicatory hearing. The respondent contends that her appointed bar counsel failed to: (1) raise deficiencies in the reunification services provided by Unity; (2) file a motion to remove Unity as the service provider for the family and (3) invoke the Americans with Disabilities Act (ADA) (42 U.S.C. § 12132) to design services based on her mental health disability.  For the following reasons, we disagree.

¶ 79    The right to counsel in child protection proceedings brought pursuant to the Juvenile Court Act is provided by statute.  Specifically, section 1-5(1) of the Act states:

> "[T]he minor who is the subject of the proceeding and his parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2016).

Our supreme court has held that although the statutory right to counsel in such proceedings lacks constitutional footing, it is closely linked to its constitutional counterpart and implies a right to effective assistance. *In re Br. M*., 2021 IL 125969, ¶ 42.  Accordingly, despite the differences between criminal law proceedings and proceedings under the Act, Illinois courts use the two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984) to evaluate claims of ineffective assistance of counsel in child protection proceedings. *Id.*

¶ 80    Under *Strickland*, to establish ineffective assistance of counsel, the complaining party must show both: (1) that her counsel's representation fell below an objective standard of reasonableness;

and (2) that there is a reasonable probability that the outcome of the proceedings would have been different absent counsel's unreasonable performance. See *Strickland*, 466 U.S. at 687. Failure to satisfy either prong of *Strickland* precludes a finding of ineffective assistance of counsel. *People v. Peeples*, 205 Ill. 2d 480, 512 (2002); *People v. Guja*, 2016 IL App (1st) 140046, ¶45.

¶ 81     In the present case, the respondent first alleges that her counsel was ineffective for failing to raise deficiencies in the reunification services offered to her by Unity with respect to J.B.'s two older siblings, T.M. and K.B. In doing so, the respondent does not explain how such services were "deficient," but instead argues that counsel should have elicited background information regarding the respondent's traumatic history as a ward to explain why she "did not want to rely on referrals from Unity but [preferred] to get her own services." The respondent contends that such an argument would have made her reluctance to engage in services provided by Unity seem "reasonable." For the following reasons, we disagree.

¶ 82     It is axiomatic that "matters relating to trial strategy are generally immune from claims of ineffective assistance of counsel." *Id.* at 929. "The choice of what evidence to present is a matter of trial strategy, to which a court considering a claim of ineffective assistance of counsel will normally defer." *In re D.C.*, 244 Ill. App. 3d 55, 68 (1992) *People v. Ward*, 371 Ill. App. 3d 382, 862 (2007).

¶ 83     In the present case, counsel's decision to forego presenting evidence regarding the respondent's experiences as a ward, constitutes sound trial strategy, because the "reasonableness" of the respondent's compliance with the reunification services offered by Unity was irrelevant to the issue before the juvenile court, namely whether J.B. was being exposed to an injurious environment. "Relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that

24

it would be without the evidence." *People v. Pikes*, 2013 IL 115171, ¶ 41. Accordingly, "[c]ounsel's failure to present irrelevant evidence" will not be construed as "incompetence." *People v. Rush*, 294 Ill. App. 3d 334, 342 (1998).

¶ 84    As already note above, here, the evidence at the adjudicatory hearing revealed that prior to J.B.'s birth, the respondent suffered from a severe, untreated mental illness, which was compounded by her drug use, homelessness and domestic violence. The evidence further established that in July 2018, the juvenile court found that J.B.'s older siblings were exposed to an injurious environment while in the respondent's care, and the respondent was ordered to participate in numerous services and treatments that would remedy the issues that brought these two children into DCFS custody. The evidence further unequivocally established that the respondent failed to participate in any of these services. Accordingly, regardless of the reasons why the respondent elected not to participate in these services, the respondent did not remedy the issues that caused her two older children to be neglected prior to J.B.'s birth.

¶ 85    As such, where the respondent continued to suffer from an acute, untreated, and symptomatic mental illness, and was noncompliant with her services, evidence regarding the reasons for the respondent's unwillingness to work with Unity would have had no bearing on the likeliness of J.B.'s exposure to an injurious environment.  In fact, as is plain from the evidence subsequently introduced at the disposition hearing, and which shall be further discussed below, evidence regarding the respondent's prior experiences as a ward and the extent of her mental health issues stemming from those experiences, had a far greater chance of harming the respondent's case by establishing in great detail the extent to which she was likely to expose J.B. to an injurious environment.

¶ 86    Moreover, even if we were to accept the respondent's argument that her unwillingness to

engage in these services was "reasonable," the respondent cannot establish prejudice stemming from counsel's failure to present such evidence at the adjudicatory hearing. In this respect, Herring testified that she repeatedly accommodated the respondent by permitting her to seek services and treatment outside of Unity, but that the respondent nonetheless failed to provide her with documentation of compliance with any of those outside services or treatment. Accordingly, even if counsel had argued that Unity's services were somehow deficient because the respondent's refusal to participate in them was "reasonable," without any evidence from the respondent as to her participation in outside services and the extent of those services and treatment, the evidence at the adjudicatory hearing would nonetheless have established that the respondent remained noncompliant. As such, but for counsel's introduction of such evidence, the result of the adjudicatory hearing would not have been different. *Strickland*, 466 U.S. at 687.

¶ 87 For these same reasons we reject the respondent's contention that she was denied effective assistance of counsel where counsel failed to seek removal of Unity as the service provider for the family.

¶ 88 Where Herring testified to her considerable efforts at providing the necessary services to the respondent as well as her accommodations regarding where the respondent could obtain such services in advance of J.B.'s birth, the respondent cannot establish that Unity's management of her case was inadequate, or that she would have participated in services if they had been provided by another agency. Under this record, counsel's failure to seek the removal of Unity does not constitute ineffective representation. See *People v. Williams*, 147 Ill. 2d 173, 238-39 (1991) ("[Co]unsel is not required to undertake fruitless efforts to demonstrate his effectiveness."); *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009) ("[C]ounsel is not required to make losing motions or objections in order to provide effective legal assistance.").

¶ 89     The respondent next contends that counsel was ineffective for failing to "invoke the [ADA] to design services based on her mental health disability."  In this respect, the respondent claims that because the ADA prohibits public entities from discriminating against people with disabilities with the "services" that they provide (42 U.S.C. § 12132),[3] under the ADA, DCFS was required to make "reasonable modifications" to her services (28 C.F.R. § 35.130(b)(7)) based on her mental illness and her counsel's failure to elicit evidence regarding that mental illness prevented the juvenile court from determining whether she was provided with services "geared toward her disability."  For the following reasons, we disagree.

¶ 90     At the outset we note that the respondent cites to no caselaw or authority for the contention that it was incumbent on counsel to raise this issue at the adjudicatory hearing or that raising such an issue could have changed the outcome of that proceeding.  Nor could she.

¶ 91     Our courts have repeatedly held, albeit in the context of parental termination proceedings, that the ADA does not apply because termination proceedings do not constitute "services, programs or activities" as set forth by the ADA.  *In re Jeanette L.*, 2017 IL App (1st) 161944; see also *In re S.R.*, 2014 IL App (3d) 140565, ¶ 28. The rationale has been that nothing in the language of the ADA suggests that an appropriate remedy for an ADA violation is the reversal of a juvenile court's order regarding the termination of parental rights.  Rather, the ADA provides a civil private right of action.  See *e.g.*, *In re La'asia S.*, 739 N.Y.S.2d 898, 909 (2002)(" 'nothing in the ADA suggests that denial of [a petition for termination of parental rights] is an appropriate remedy for an ADA violation.' "); *In re B.S.*, 166 Vt. 345, 353-54 (Vt. 1997) ("[N]othing in the ADA suggests that denial of [a termination proceeding] is an appropriate remedy for an ADA violation. ***

---

[3] This section of the ADA specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

[O]ther courts have refused to graft ADA requirements onto unrelated statutes.") *In re Torrance P.*, 187 Wis. 2d 10 (1994) ("Congress enacted the ADA to eliminate discrimination against people with disabilities and to create causes of action for qualified people who have faced discrimination. [Citation.] Congress did not intend to change the obligations imposed by unrelated statutes. [The respondent-parent in a termination proceeding] may have a separate cause of action under the ADA based on the County's actions or inactions; such a claim, however, is not a basis to attack [the termination] order."); *Stone v. Daviess County Director of Child Services*, 656 N.E.2d 824, 830 (the ADA is not a defense to termination proceedings and "any alleged noncompliance with the ADA *** would be a matter separate and distinct form the operation of our termination statute.")

¶ 92    We agree with the rationale of these decisions and find that they apply equally to adjudicatory hearings brought pursuant to the Act.  In this respect, we find the decision of our appellate court in *In re Jeannette L.*, 2017 IL App (1st) 161944, instructive. In that case, the juvenile court found that the mother, who had cognitive and developmental delays, was unfit to parent because she failed to maintain a reasonable degree of interest, concern or responsibility in her children and had failed make reasonable efforts or progress towards reunification. *Id.* at ¶ 11. On appeal, the mother argued that the reunification services provided to her did not reasonably accommodate her developmental disability in violation of the ADA. *Id.* at ¶ 15. Although the mother forfeited this claim by failing to raise it before the trial court, on appeal, this court found that her ADA claim was nevertheless meritless because termination of parental rights proceedings are not "services, programs, or activities" that fall under the purview of the ADA. *Id.* at ¶ 17.

¶ 93    The same reasoning applies here. Nothing in the ADA suggests that an appropriate remedy for an ADA violation is the dismissal of a petition for adjudication of wardship, nor does the ADA suggest that a violation of that Act serves as a defense to allegations of abuse and neglect in

28

juvenile court proceedings.

¶ 94 Accordingly, in the present case, we find that there was no legal basis for counsel to invoke the ADA at the respondent's adjudicatory hearing.

¶ 95 Moreover, even if there had been a legal basis for counsel's invocation of the ADA, the respondent cannot establish prejudice arising from counsel's failure to raise such an argument. As already noted above, the respondent refused to permit Unity to obtain her mental health records and was noncompliant with all recommended mental health services offered by that agency. Her failure to cooperate with mental health services and to provide needed documentation to determine the nature and extent of any mental health diagnosis now precludes her from arguing that the agency was not doing enough to assist her with mental health concerns under the ADA.

¶ 96 Accordingly, for all the aforementioned reasons, we find that the respondent has failed to establish that counsel was ineffective under *Strickland*.

¶ 97                                    C.  Disposition Order

¶ 98 On appeal, the respondent next challenges the juvenile court's disposition findings as being against the manifest weight of the evidence. In this respect, the respondent contends that the juvenile court did not consider the best interests of J.B. when it failed to "examine" the State's witnesses or make an "independent inquiry" into "discrepancies" in the State's disposition evidence. We disagree.

¶ 99 Under the Act, once a minor has been adjudicated neglected, at the disposition hearing, the juvenile court may commit the minor to wardship upon a finding that the minor's parents are unable or unwilling or unfit, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if she remains in the custody of her parents. 705 ILCS 405/2–27(1) (West 2018); *In*

*re Harriett L.–B.*, 2016 IL App (1st) 152034, ¶ 30. Such a decision must be supported by a preponderance of the evidence. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 56. The juvenile court's decision may only be reversed if its factual findings are against the manifest weight of the evidence. *In re Harriett L.–B.*, 2016 IL App (1st) 152034, ¶ 30.

¶ 100   In the present case, the evidence admitted at J.B.'s disposition hearing overwhelmingly established that the respondent was unable to parent J.B. and that J.B. would be at risk if she returned to her care. According to the IA, which was introduced at that hearing, the respondent, who had a traumatic and abusive childhood in the home of her adoptive mother, first manifested signs of mental illness when she was a young teen. The respondent was then returned to DCFS foster care, where she began exhibiting severe symptoms of her mental illness, including violent and disruptive behavior, that required prolonged psychiatric hospitalizations. According to the IA, the respondent's mental illness remains untreated and unmedicated and she does not understand its severity.

¶ 101   The IA further established that after her emancipation, the respondent experienced chronic housing instability and unemployment and struggled to find a place for her and her first child, T.M., to live. The respondent has therefore engaged in criminal activity to support herself financially. She also continues to endure domestic violence, dating men who use drugs and physically abuse her. The respondent reported domestic violence with her current boyfriend but claimed that it was "nothing bad." The respondent also continued to struggle with her own drug addiction, which impacted her ability to function daily and work.

¶ 102   According to the IA, the respondent has also demonstrated poor parenting knowledge and insight. She verbally abused her one-year-old child, failed to understand the danger of a two-year-old child's independent use of a stovetop, and was unable to recognize any issue related to her

son's severe speech impediment. In addition, the respondent used marijuana throughout her pregnancies and ingested an entire bottle of wine while pregnant with K.B, believing that it would be beneficial to her baby. She also intentionally induced K.B.'s preterm labor.

¶ 103 The IA explained that the respondent's "historical and unprocessed traumatic experiences" of neglect, physical and sexual abuse, as well as her attitudes, poor relationships, drug use and parenting style show that she lacks "the capacity to manage her emotional responses," which "places her children at significant risk." In addition, the IA noted that the respondent has "minimal insight" into how her untreated mental illness, trauma symptoms, marijuana use, and poor emotional regulation impact her children.

¶ 104 The evidence at the disposition hearing further established that even though the IA recommended a series of services that were "essential to a safe reunification" between the respondent and J.B. (including on-going trauma informed therapy, a psychiatric assessment, psychiatric medication monitoring, a psychological assessment, substance abuse treatment, domestic violence services, parenting education, parent coaching, and ongoing participating with the NYAP homeless youth mentorship and housing assistance program) as of the date of the disposition order, the respondent had not completed these services.

¶ 105 In addition, testimony from Unity supervisor Mottley established that the respondent continues to exhibit violent and erratic behavior. According to Mottley, only recently, the respondent called and "cursed out" HCS' therapists and director, informed staff members at Unity that she planned to "come to the agency and beat everyone up," and sent "threatening text messages" to J.B.'s new foster parents. The respondent was also involved in a "stabbing incident" with her boyfriend's cousin. As a result, the respondent's supervised visitation with J.B. has been suspended.

¶ 106   Finally, evidence at the disposition hearing established that since the beginning of her DCFS case the respondent has failed to achieve unsupervised visitation with any of her children.

¶ 107   Under this record, we find nothing manifestly erroneous in the juvenile court's finding that the respondent was unable to care for J.B. and that J.B. should be made a ward of the court.

¶ 108   The respondent nonetheless asserts that the disposition finding should be reversed because the juvenile court failed to engage in its role as *parens patrie* to ensure that the outcome of the proceedings would be in J.B.'s best interests. Specifically, the respondent argues that numerous "red flags" in the evidence offered at the multi-day disposition hearing should have put the juvenile court on notice that Unity's handling of the case placed J.B. at risk and did not provide the respondent with appropriate reunification services. As the respondent points out, at the initial disposition date, Unity's supervisor Mottley, incorrectly stated that J.B. was two years old, when, in fact, she was only eight months, and was insufficiently familiar with the case even though she had been assigned to it for ten months. The respondent further asserts that as a result for 15 months, J.B. was placed in a home that the IA found to be a risk to her safety and was removed to a new foster home by Unity only after the fictive kin foster parent failed to take the minor to her medical appointments. The respondent also points out that Unity was assigned to provide services to the respondent despite having failed to protect her when she herself was a ward of the court. In addition, the respondent contends that despite IA's recommendation that Unity coordinate and collaborate with NYAP to best engage the respondent in services, no testimony was elicited that such collaboration occurred. Under these facts, the respondent argues that the trial court should have *sua sponte* found that Unity was not qualified to provide effective services to the respondent's family and should have removed Unity as the family's service provider.

¶ 109   At the outset, we note that the respondent's arguments are forfeited as she failed to raise

them or object to the juvenile court's conduct during the disposition hearing or in a post-hearing motion. See *In re William H.*, 407 Ill. App. 3d 858, 869-70 (1st Dist. 2011) (to preserve an alleged error for appellate review, a party must, even in child custody matters, object at the disposition hearing and file a posttrial motion addressing it); *In re April C.*, 326 Ill. App. 3d 225, 242 (1st Dist. 2011) (where a party fails to make an appropriate objection in the court below, she has failed to preserve the question for review and the issue is forfeited). Nor does the respondent contend on appeal that we should review her arguments under the plain error doctrine. See *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) (explaining that when a respondent forfeits review of her claims and does not argue plain error, the appellate court should not reach the merits of those issues).

¶ 110 Forfeiture aside, however, we nonetheless find the respondent's contentions to be meritless. A thorough review of the disposition hearing reveals that the juvenile court was appropriately involved in the proceedings and made its findings regarding the respondent's inability to take care of J.B. after a thorough consideration of all the evidence. Contrary to the respondent's position, it was the juvenile court that questioned Mottley during the original disposition date and determined based on her answers that she was insufficiently prepared to testify, requiring a continuance. Moreover, any concerns regarding J.B.'s initial placement with the fictive kin were addressed prior to the second disposition date, by which J.B. was removed from the fictive kin's care and placed in a new foster home with a parent who provided her with the "the best of care," and where she was excelling. Unity social worker Scott testified at the second disposition date that he visited J.B.'s new, traditional foster home within the last 30 days and found it to be a safe and appropriate placement for her. Accordingly, the juvenile court had no reason to question Unity's initial placement where, by the next disposition date, Unity had appropriately addressed the issue and found a new home for J.B.

¶ 111   Contrary to the respondent's position, the juvenile court also had no reason to fault Unity for initially placing J.B. with the respondent's fictive kin, as DCFS was statutorily obligated to make reasonable efforts to place J.B. with any of her adult relatives who was ready, willing, and able to care for her before placing J.B. in a traditional foster home.  See 20 ILCS 505/7(b) (West 2018).

¶ 112   Moreover, as already discussed above, the evidence at the second disposition hearing revealed that the respondent continued to act violently and erratically even after J.B. was removed from the fictive kin's care and placed in the care of a traditional foster family.  In addition, the evidence established that the respondent failed to complete the mental health assessments, therapy, and services necessary for reunification through Unity or any other agency.

¶ 113   Under this record, we are unable to conclude that the juvenile court acted with disregard to J.B.'s best interests when it failed to *sua sponte* remove Unity as the agency for the family, and therefore affirm its disposition findings.

¶ 114   In so doing, we are cognizant that the system utterly failed the respondent in her youth, and that her present unwillingness or inability to obtain treatment and services from Unity or any other agency is at least in part to be blamed on this failure. As much as we empathize with the respondent's plight, however, we cannot allow these past failures to be borne out by her children. Where the respondent's mental illness remains untreated and unmedicated, and she has yet to formally process her traumatic childhood experiences and gain the tools necessary to prevent such patterns from repeating in her own parenting, the juvenile court's determination that she is unable to care for J.B. and that J.B. be made a ward were proper.

¶ 115                                IV. CONCLUSION

¶ 116   For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 117   Affirmed.