2026 IL App (1st) 251410-U

FIRST DIVISION
March 2, 2026

No. 1-25-1410

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| IN THE INTERESTS OF T.M., K.B., J.B., and A.B., | ) |
| | ) Appeal from the |
| Minors-Respondents-Appellees, | ) Circuit Court of |
| | ) Cook County |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) Child Protection Division |
| | ) |
| Petitioner-Appellee, | ) |
| v. | ) Nos. 2018 JA 18; 2018 JA 19; |
| | ) 2019 JA 195; 2020 JA 1073 |
| TIA J.-T., | ) |
| | ) Honorable |
| Mother-Respondent-Appellant). | ) Peter J. Vilkelis, |
| | ) Judge Presiding. |

PRESIDING JUSTICE FITZTERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1   *Held*: We affirm the termination of the mother's parental rights, where the circuit court's finding that she was unfit and that it was in the minors' best interests that her parental rights be terminated was not against the manifest weight of the evidence.

¶ 2   This cause of action arises from the State's petitions to terminate the parental rights of the respondent, Tia J.-T., as to her four children, T.M., K.B., J.B. and A.B. Following a hearing on the

State's petitions, the circuit court found the respondent to be unfit because she had failed to: (1) maintain a reasonable degree of interest, concern and responsibility as to the children's welfare; and (2) make reasonable efforts to correct the conditions that were the basis for their removal from her care. See 750 ILCS 50/1(D)(b), (m) (West 2024); 750 ILCS 405/2-29 (West 2024). The circuit court further found that it would be in the minors' best interests to terminate the respondent's parental rights. 750 ILCS 405/1-3(4.05) (West 2024). The respondent now appeals from that termination decision. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      At the outset, we note that despite the voluminous record before us and the grave nature of a termination proceeding, which involves the complete severance of the parent-child relationship, none of the parties on appeal have taken the time to provide us with an adequate statement of facts. Instead, both the respondent's brief and the guardian's brief (leisurely adopted by the State) at best provide cursory and scant references to portions of over eight years of proceedings, which ultimately led to the termination of the respondent's parental rights. In addition, disappointingly, both briefs contain numerous miscitations to the record to documents that are either non-existent or found elsewhere. That said, having ourselves performed a thorough review of the record, we have been able to glean the following relevant facts and procedural history.

¶ 5      The respondent is the biological mother of four minors: one boy, T.M. (born on November 4, 2013) and three girls, K.B. (born on December 24, 2017), J.B. (born on February 13, 2019) and A.B. (born on July 19, 2020). T.M.'s biological father is Keeland M., and A.B.'s biological father is Jamez B.[1] K.B.'s and J.B.'s biological fathers are unknown.

---

[1]On July 1, 2025, the circuit court found both Keeland and Jamez to be unfit and terminated their parental rights. Neither father is a party to this appeal. Jamez appealed separately, after which pursuant to *Anders v. California*, 386 U.S. 738 (1967), we permitted his appellate counsel to withdraw and affirmed the circuit court's termination decision. See *In re A.B.*, No. 1-24-1431 (June 3, 2025) (unpublished

¶ 6    The respondent, herself, was a ward of the Department of Children and Family Services (DCFS) and came into the system when she was only six months old because of her own mother's severe and prolonged issues with drug abuse and bipolar disorder. Unity Parenting and Counseling Inc. (Unity) was the social service agency assigned to service the case. The respondent's childhood while in DCFS care was traumatic. She was placed with and eventually adopted by a relative caregiver, Paula F., in whose home she repeatedly experienced sexual abuse, first as a toddler and then as an adolescent by another child living in the same household. At age 12, the respondent engaged in cutting behaviors and attempted suicide twice. A year later, she stabbed Paula's boyfriend, after which she was diagnosed with bipolar disorder and placed on psychotropic medication. Later that same year, the respondent was psychiatrically hospitalized after making threatening statements to Paula and returned to DCFS custody because Paula refused to allow her to return to her home. At age 14, the respondent experienced domestic violence from her then 24-year-old boyfriend, who physically assaulted and impregnated her, but subsequently had a miscarriage. At age 15, the respondent was arrested for strong-arm robbery. Soon thereafter, she was psychiatrically hospitalized for several months at Hargrove Hospital after threatening to burn down her foster parent's home. After her discharge from Hartgrove, the respondent was briefly housed in Allendale Residential Facility, before being provided with her own apartment until she could age out of the foster care system.

¶ 7    The respondent gave birth to her first child, T.M., on November 4, 2013, when she was only 17 years old and still a ward of the State. The instant case first came to the attention of DCFS in August 2014, when it was reported that the respondent was observed using marijuana and telling her then one-year-old son to "shut the f*** up. I'm gonna punch you in your face if you don't shut

---

summary order pursuant to Illinois Supreme Court Rule 23(c) (2), (4)). The record does not disclose whether Keeland appealed his termination decision.

3

up. Wait until we get out of the car, I'm going to punch you in your f****** face." After a placement case was opened, it was mutually decided that T.M. would be cared for by a relative without DCFS involvement. Thereafter, T.M. resided with the respondent's biological sister, Toiya T.

¶ 8 On December 24, 2017, the respondent gave birth to her second child, K.B., who was born prematurely and tested positive for marijuana, and hospital personnel made a hotline call to DCFS. At that time, DCFS learned that during her pregnancy with K.B., the respondent had been hospitalized at least twice. First, in July 2017, the respondent was treated at Jackson Park Hospital for injuries she sustained following a physical altercation with her then boyfriend, who had beat her on her back and legs. Two months later, in August 2017, the respondent was treated at Jackson Park Hospital for depression and suicidal ideation, at which point she informed doctors that she had no place to live.

¶ 9 Based on this information, on January 9, 2018, the State filed a joint petition for the adjudication of wardship of T.M. and K.B. asserting that they were both exposed to an injurious environment and at a substantial risk of physical injury (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2018)). The petition alleged, *inter alia*, that the respondent had a previous diagnosis of bipolar disorder and had been hospitalized several times for suicidal ideation, and that she had threatened to harm herself while pregnant with K.B. The petition further alleged that the respondent was not receiving any mental health treatment and that, according to hospital personnel, she needed a mental health evaluation. In addition, the petition alleged that while pregnant with K.B., the respondent tested positive for marijuana and cocaine. The petition also alleged that the respondent was undomiciled and that she had been observed throwing a phone across the room in T.M.'s presence.

¶ 10    On July 11, 2018, the circuit court found both T.M. and K.B. to be neglected based on their exposure to an injurious environment while in the respondent's care. See 705 ILCS 405/2-3(1)(b) (West 2018). On November 30, 2018, after a disposition hearing, the court adjudicated both minors wards of the court and placed them in foster care with their maternal aunt, Latanique F.[2] Unity was again assigned as the service provider for the family. The respondent did not appeal either order.

¶ 11    Four months later, on February 13, 2019, the respondent gave birth to her third child, J.B. Upon admission to the hospital and prior to delivery, the respondent again tested positive for marijuana. As a result, on March 1, 2019, the State filed a petition for an adjudication of wardship of J.B. alleging that she was exposed to an injurious environment and at a substantial risk of physical injury (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2018)). According to the petition, the respondent had two other minors in custody of DCFS with findings of neglect and had yet to engage in reunification services. The petition further alleged that the respondent was diagnosed with bipolar disorder and was psychiatrically hospitalized on multiple occasions for suicidal ideation[3] but had failed to make herself available for an assessment, had not engaged in mental health treatment, and had not resumed taking her psychotropic medication.

¶ 12    After the State filed its petition, the respondent initially refused to produce J.B. and threatened to harm anyone who attempted to take her away. A week later, however, she appeared in court with J.B. and a staff member from the National Youth Advocate Program (NYAP), whereupon J.B. was taken into protective custody and placed in a fictive kin foster home with

---

[2] The record reflects that Latanique is Paula's biological daughter, and that she grew up in Paula's home together with the respondent.

[3] The record reflects that by 2019, since the age of 16, the respondent had been psychiatrically hospitalized over 20 times.

Taryn T.[4]

¶ 13    Several months later, on May 10, 2019, the respondent was brought to Jackson Park Hospital emergency room by police officers after exhibiting psychotic symptoms including agitation, aggression, and erratic behavior. Upon admission, the respondent tested positive for marijuana, could not calm down and needed to be sedated. The respondent told medical personnel that she had gone to J.B.'s foster parent's home attempting to speak to J.B., after which the foster parent had called the police. The respondent told hospital staff that she had concerns that her child was being abused.

¶ 14    On November 20, 2019, after an adjudicatory hearing, the circuit court found that J.B. was neglected based on her exposure to an injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2018). Soon thereafter, DCFS found that the fictive kin, Taryn, was not an appropriate foster parent and removed J.B. from her care.[5] On July 22, 2020, DCFS placed J.B. with her maternal aunt, Latanique, who was already fostering the respondent's two older children, T.M. and K.B. On

---

[4] The record reflects that Taryn was the paramour of Tony T., another one of Paula's biological children, and that, for a period of time during the respondent's childhood, she lived in Paula's home and acted as the respondent's caregiver.

[5] The record reflects that the removal came about after an April 17, 2019, DCFS Integrated Assessment report (2019 IA) questioned the appropriateness of the fictive kin caregiver. According to that report, J.B. "had delays in multiple domains" because of the fictive kin's parenting and her serious gaps in knowledge of basic infant care (including, *inter alia*: failure to do "tummy time," keeping J.B. in a car or bouncy seat for most of the day, calling J.B. "greedy" because milk spilled out of her mouth, and expressing the belief that holding J.B. would "spoil her"). In addition, the 2019 IA expressed concern that the fictive kin, who described herself as one of the respondent's childhood caregivers in Paula's home, had indicated that she planned to use Paula as a child care provider when she returned to work, despite a DCFS restriction that prohibited Paula from having any more children in her care and the fact that she herself was "unable to protect" the respondent in her childhood.

January 8, 2021, after a disposition hearing, J.B. was adjudged a ward of the court, and it was ordered that she remain in foster care with Latanique.

¶ 15    The respondent appealed both the neglect finding and J.B.'s adjudication of wardship. *See In re J.B.*, 2021 IL App (1st) 210098-U. In doing so, among other things, she asserted that her failure to cooperate and/or participate in the requisite reunification services resulted from her lack of trust in Unity because this was the same agency that had serviced her during her traumatic childhood. *Id*. ¶ 113. As a result, the respondent argued that the circuit court erred by not *sua sponte* removing Unity as the service provider. *Id*. In affirming the circuit court, we recognized that "the system" had "utterly failed the respondent in her youth," and that her "unwillingness or inability to obtain treatment and services from Unity" in order to reunify with her children was "at least in part to be blamed for this failure." *Id*. ¶ 114. Nonetheless, we found that Unity had made reasonable efforts to prevent or eliminate the necessity of removal, and that any failures of the agency should "not be borne out by" the respondent's children. *Id*. Accordingly, we concluded that where the respondent failed to complete the requisite mental health assessments, therapy, and services, and curb her violent and erratic behavior, the circuit court's neglect and adjudication findings with respect to J.B. were proper. *Id*. ¶¶ 76, 114.

¶ 16    In the meantime, on July 19, 2020, the respondent gave birth to her fourth child, A.B. Three days later, on July 22, 2020, she underwent a psychiatric evaluation at Mt. Sinai Hospital, after which she was diagnosed with post-traumatic stress disorder (PTSD), panic disorder, and recurrent major depressive disorder (and not bipolar disorder). Five days later, on July 27, 2020, the State filed a petition for the adjudication of wardship of A.B., alleging that she was exposed to an injurious environment and at a substantial risk of physical injury (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2020)) because, *inter alia*: the respondent had three other children in DCFS custody,

7

suffered from the aforementioned mental health diagnoses and needed to complete a psychological evaluation.

¶ 17    Following an adjudicatory hearing, on September 29, 2022, the court found A.B. to be neglected based on an injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2022). On October 21, 2022, following a disposition hearing, the court adjudicated A.B. a ward of the court. At the respondent's request, A.B. was placed in foster care with her paternal grandmother, Jamez's mother, Lakita G. The respondent did not appeal.

¶ 18    In December 2023, after a new circuit court judge was assigned to the respondent's case, the court *sua sponte* ordered that Unity be removed as the service provider for the family and transferred the case for services through DCFS.

¶ 19    Following years of permanency goals set as reunification, on July 17, 2024, the circuit court changed the goal to substitute care pending a determination on the termination of the respondent's parental rights. The change was brought about by the respondent's failure to comply with the recommended reunification services, and an April 2024 incident, which shall be discussed further below, after which the respondent's visitation rights were suspended pending a psychological examination.

¶ 20    On October 16, 2024, the State filed supplemental petitions for the appointment of a guardian with the right to consent to adoption asking the court to find the respondent an unfit parent and to terminate her parental rights.

¶ 21    On March 21, 2025, the circuit court held a termination hearing at which the respondent chose to proceed *pro se*.[6] During the fitness portion of that hearing, the circuit court took judicial

---

[6]The record reveals that upon remand from our decision in *In re J.B.*, 2021 IL App (1st) 210098-U, the respondent initially proceeded *pro se* but was appointed backup counsel, whom she subsequently

notice of all of its prior findings in the respondent's case and admitted into evidence DCFS's biannual family service plans between January 2019 and July 2024, offered as State's exhibits. Three witnesses then testified on behalf of the State: (1) former Unity case worker, Michelle Howard, who was assigned to the respondent's case between July 2021 and November 2022; (2) DCFS caseworker Mary Robinson, who worked on the case between January 2023 and the present; and (3) DCFS caseworker Mariah Irby who was assigned to the case between March 2024 and June 2024, while Robinson was on medical leave. Cumulatively, this evidence establishes the following.

¶ 22    In July 2021, Howard, working for Unity, assessed the respondent as needing the following services before she could be reunified with her children: individual therapy, a psychiatric assessment, a substance abuse assessment, a psychological assessment, a parenting capacity assessment, a domestic violence assessment, and parenting services. The respondent initially told Howard that she was willing to do anything to get her children back, but ultimately never successfully completed any of the services she was referred to.

¶ 23    Specifically, according to Howard, for individual (trauma informed) therapy, the respondent was referred to in-house counseling with Unity and to Howard Counseling Services (HCS). The respondent never engaged in therapy with Unity and was unsuccessfully discharged from HCS due to aggressive behavior. Howard also referred the respondent for a substance abuse assessment to Abraxas and SEADAC, and for a psychological evaluation at Unity, but the respondent completed neither. In addition, the respondent was given referrals for domestic

---

fired. The circuit court later persuaded the respondent to take an attorney and she requested "Mr. Jaffey," who was appointed, but then withdrew. The court subsequently appointed another attorney, who eventually also withdrew his representation.

violence services and offered section 8 housing in Decatur but refused both.

¶ 24   According to Howard, the respondent continued to reside with Jamez and Howard was aware of several domestic violence incidents between the two. Specifically, Howard recalled that in June 2022, the respondent telephoned her cursing and screaming that Jamez had hit her and tried to kick her out of their apartment after which she broke all their stuff.

¶ 25   Howard acknowledged that after this incident, the respondent provided her with information that she was psychiatrically hospitalized at St. Anthony's Hospital between June 9, and June 13, 2022, but testified that, to the best of her knowledge, in December 2023, when the case was reassigned from Unity to DCFS, the respondent's recommended psychiatric services remained outstanding.

¶ 26   Hospital records from the respondent's June 2022 hospitalization reveal that the respondent was involuntarily admitted to Holy Cross Hospital on June 9, 2022, after she "reportedly got into a fight with her boyfriend and since then ha[d] been walking up and down her apartment building smashing windows and threatening people." The respondent presented in the emergency room as "acutely psychotic," "irate, threatening staff," and "had to be immediately sedated." The attending physician certified that she was "a danger [both] to herself and others." On June 10, 2022, the respondent was transferred from Holy Cross Hospital to St. Anthony's Hospital where she was voluntarily admitted for treatment with antipsychotic medication. Upon discharge, she was prescribed antidepressants.

¶ 27   Howard next testified that during her 15-month tenure as the case-worker on the respondent's case, the respondent was allowed only video call visits with her children because of

a previous incident with a foster parent, which involved the respondent stabbing a relative,[7] and because she had exhibited aggressive behavior towards prior service providers.[8] Howard, who supervised these video calls, testified that the respondent was "fairly consistent" with her visits, and although there were occasional concerns about her behavior, she could be redirected "sometimes." The respondent's video visits were again suspended on March 19, 2022, after she was inappropriate with a foster parent in front of the children. Thereafter, the foster parent refused to have contact with the respondent. The respondent was repeatedly told that to regain visitation, she would need to engage in the assessed services, and, in the very least, complete a psychological evaluation, but failed to do so.

¶ 28    When DCFS took over the case in January 2023, according to the newly assigned caseworker Robinson, the respondent's outstanding services aimed at reunification included: individual therapy, a psychiatric evaluation, a psychological evaluation, a domestic violence assessment and a judicially ordered parenting capacity assessment. Although Robinson provided the respondent with referrals to all these services, the respondent failed to successfully complete any of them.

¶ 29    Specifically, with respect to individual therapy, in 2023, Robinson referred the respondent to Arch Angels and then to Chatham Family Counseling, neither of which the respondent engaged. Robinson then referred the respondent to Latino Family Services, from which she was discharged

---

[7] The record reveals that on October 11, 2020, the respondent stabbed Jamez's cousin. The respondent was charged with a misdemeanor, and subsequently (on April 19, 2022) convicted and sentenced to two years' probation with electronic monitoring.

[8] The record reveals that between April 2020 and January 2021, the respondent "cursed out" HCS's therapists and director, informed staff members at Unity that she planned to "come to the agency and beat everyone up," sent T.M.'s, K.B.'s and J.B.'s foster parents threatening messages and repeatedly submitted false reports against them to the DCFS Hotline.

after being belligerent. In January 2024, Robinson referred the respondent to EPIC Counseling. Although the respondent engaged in individual therapy there, she refused to sign the requisite DCFS consent form and was ultimately discharged for being combative. According to Robinson, to this date, the respondent has not completed individual therapy.

¶ 30     Robison also referred the respondent for a DCFS-approved psychological evaluation with Dr. Blackman, but the respondent refused to engage in this assessment, and thereafter, repeatedly informed Robinson that she would not take part in any service provided by DCFS.

¶ 31     Robinson further referred the respondent for domestic violence services to Metropolitan Family Services Center for Advancing Domestic Peace, but the respondent did not engage in this program. In addition, the circuit court ordered that the Cook County Juvenile Court Clinic complete an evaluation of the respondent's parenting capacity, but the respondent refused to participate.

¶ 32     Robinson next acknowledged that on November 1, 2022, the respondent informed her that she had completed a psychiatric evaluation with Evelyn Norton, at SMG St. Casimir, which diagnosed her with recurring major depression disorder, PTSD, and panic disorder. Robinson, however, explained that when she contacted Norton, she discovered that Norton was not a psychiatrist, but rather a nurse practitioner, who prescribed and monitored the respondent's medication compliance. Robinson communicated with Norton until July 2023, after which the respondent refused to sign a DCFS consent form, which would allow Robinson to continue to receive updates from Norton regarding the respondent's bi-monthly visits and medication compliance. Robinson testified that without the consent form, Norton was not considered a DCFS-approved psychiatric service.

¶ 33     With respect to visitation, Robinson testified that when she inherited the case from Unity,

the respondent was not allowed any visits with her children. However, after Norton's November 1, 2022, psychiatric evaluation recommended that the respondent would benefit from seeing her children, beginning on March 5, 2023, Robinson initiated weekly, in-person supervised visits. According to Robinson, the respondent was "mostly consistent" with these visits and did well, particularly in the beginning. Robinson's notes reveal that when the weather was nice, Robinson would allow the visits to take place at the local library. However, when Robinson subsequently informed the respondent that future visits would have to take place in the DCFS office, the respondent became combative and needed to be told that visits would be suspended if she could not control her outbursts and temper. Robinson noted only one other "concern" with in-office visitation, *i.e.*, when the respondent directed her not to tell her children what to do after Robinson had instructed them to clean up after a visit.

¶ 34    On April 5, 2024, while Robinson was on medical leave, the respondent's visits were suspended indefinitely pending psychiatric and psychological evaluations and never reinstated. Robinson explained that even though upon her return from medical leave she repeatedly informed the respondent that she needed to complete psychological and psychiatric evaluations before visitation could resume, the respondent continued to refuse any services offered through DCFS.

¶ 35    DCFS caseworker Irby next testified that while Robinson was on medical leave, she was responsible for supervising the respondent's in-person visitation with her children. On April 3, 2024, during such a visit, the respondent brought T.M. (then nine years old) a cell phone as a gift. Irby explained that per DCFS guidelines, children are permitted to have cell phones only if the foster parents agree. Irby let T.M. have the cell phone until he arrived at his foster house, but after a conversation with the foster parent, agreed that T.M. should not be given the cell phone to keep. Irby explained that T.M. already had a cell phone but that it had been taken away by his foster

parents because of his behavior. Irby therefore took the cell phone back to the DCFS office and texted the respondent that she could pick it up.

¶ 36     According to Irby, the respondent became irate, and for the next 24 hours, called Irby over 50 times and sent her threatening text messages and voicemails, one of which read: "B**ch, I'm going to slap you. You're dirty. You're a thief. You stole my property. I'm going to file a police report on you." The respondent also found Irby's father's address online and threatened to go to his house and harm him. Irby was forced to block the respondent's phone numbers and filed a police report against her.

¶ 37     Because this incident raised concerns regarding the respondent's mental health and the safety of her children, a decision was made by Irby and her supervisors to suspend the respondent's visits and all communication with her children until she completed both a psychiatric and a psychological assessment. After Irby emailed the respondent with this decision and plan, however, the respondent replied that she would not complete any services until Irby was "off the case" and her three oldest children were removed from the foster parent's home. The respondent, however, never followed up or completed a psychological or a psychiatric evaluation, even after Robinson returned from medical leave and replaced Irby as the case worker.

¶ 38     In response to the State's evidence, at the fitness hearing, the *pro se* respondent called three witnesses: (1) the original 2017 DCFS investigator on the case, Marcelita Vargas; (2) Unity caseworker Priscilla Herring, assigned to the case between 2018 and 2022; and (3) Jamez.

¶ 39     The respondent first unsuccessfully attempted to question Vargas and Herring regarding different documents in the record, which she believed established that DCFS had taken her children into protective custody without any justification because there was no evidence that they were born substance-abused to anything other than marijuana. She also unsuccessfully attempted to question

both witnesses regarding her participation in numerous reunification services. Only Herring acknowledged that in February 2019, she received an email from NYAP coordinator, Amanda Cunnihgham, that the respondent had participated in their homeless prevention program, which provided her with housing, mentorship, and mental health treatment.

¶ 40     The respondent next unsuccessfully attempted to question Jamez about a domestic violence class that she alleged he paid her to complete online for him, and about his attempts to sabotage the instant hearing so that she would "lose [her] child." Specifically, the respondent asserted that although Jamez had always permitted her to telephone A.B., in the past 30 days he and his mother had been "working together" to prevent her from speaking with her daughter. The respondent also stated that in the past week Jamez and his mother had been "antagonizing" her and "doing evil things" to get her to react and threaten them so they could report her to DCFS. The respondent further alleged that she had just received text messages from Jamez, who was appearing at the hearing on Zoom, antagonizing and threatening her, which he knew would "mess with [her] mental [state.]" The respondent therefore asked that A.B. be removed from her current foster home with Jamez's mother, Lakita. At this point, without the court's permission, Jamez left the Zoom call because he did not wish to answer any more of the respondent's questions. The circuit court then stated that it would consider the respondent's prior statements during questioning as her own testimony.

¶ 41     The respondent next introduced and the court admitted into evidence approximately 27 exhibits. Summarized, these exhibits reveal that beginning in 2020, the respondent participated in the following services. The respondent completed two parenting courses (with Parenting Piece and Family Focus) on May 6, 2020, and a parent coaching class with Family Focus on January 8, 2021. The respondent also completed two anger management courses with North American Learning

Institute on July 7, 2022, and Anger Masters on August 23, 2024. In addition, on December 14, 2023, she completed a domestic violence class with Family Rescue.

¶ 42    With respect to individual therapy, the exhibits reveal that since 2020, the respondent self-referred and participated in the following treatments. First, according to a letter from Joseph Anthony DeAsa, LCPC, at Hollenbach Clinic (within the Mt. Sinai Health System) for two months between October 27, 2020, and December 9, 2020, the respondent attended biweekly individual psychotherapy sessions with him. On January 6, 2021, the respondent again saw DeAsa at Hollenbach Clinic and was provided with an individualized six-month action treatment plan for her PTSD and major depressive disorder. It is unclear from the record, however, whether the respondent ever followed through with this treatment. Instead, nearly a year and a half later, on November 1, 2022, she underwent a psychiatric evaluation with Norton at Mt. Sinai Hospital. Afterwards, according to Norton's progress notes between March 2023 and October 29, 2024, she attended her biweekly appointments, was medication-compliant, and appeared to be stable. Finally, a letter from Yasmine Townsley Martinez, MSW, LSW, at Northeast Family Services reveals that between April 26, 2024, and October 4, 2024, the respondent attended individual therapy sessions with her and "successfully completed" the "recommended individual therapy treatment service plan."

¶ 43    After the parties' arguments, based on the aforementioned evidence, the circuit court found that the State had met its burden in establishing by clear and convincing evidence that the respondent was unfit. The court noted that in coming to this conclusion, in addition to the testimony of the case workers, it had considered all the exhibits introduced by both parties. The court found that it was evident that the respondent suffered from serious mental health issues, which caused her to be violent towards others and for which she had been psychiatrically hospitalized over 20

times in the past, and most recently in June 2022. The court observed that during this last episode, when she was involuntarily hospitalized at Holy Cross Hospital, the respondent was described by hospital personnel as a danger to herself and others, needing restraint and sedation. The court acknowledged that the respondent's mental health issues, at least in part, stem from trauma she had experienced as a child in the DCFS system, while being serviced by Unity, but noted that in December 2023, "out of an abundance of caution," it had removed Unity as the service provider and reassigned the case to DCFS to "hit the re-set button and have the whole thing start all over again, to give [the respondent] another chance." Nonetheless, the court observed, even after this change, the respondent had failed to successfully engage in any of the services offered.

¶ 44    The court also found relevant that the respondent could not control her anger even when it jeopardized her visitation rights with her children, as testified by Irby and evinced by her numerous unsuccessful discharges from services for aggressive behavior. In this respect, the court also noted that in 2022, when she was hospitalized for a violent episode after a fight with her boyfriend, the respondent had already been on probation with an ankle monitoring bracelet for a prior violent incident in which she had attacked a family member.

¶ 45    Ultimately, the court concluded that while the respondent "clearly lov[ed] her children and [wa]s very emotional about it," her "consistent adversarial attitude and her obvious continuing mental health challenges ma[de] it very difficult for her to maintain a reasonable degree of interest, concern or responsibility" for her children and "to make reasonable efforts and/or reasonable progress toward" their return "within nine months." Accordingly, the court found the respondent to be an unfit parent. See 750 ILCS 50/1(D)(b), (m) (West 2024).

¶ 46    After making its unfitness finding, the court immediately proceeded to address the best interests of the minors. DCFS case worker Robinson was recalled as the sole witness and testified

about the minors' foster homes. According to Robinson, T.M. (11 years old), K.B. (7 years old), and J.B. (6 years old) were placed in the same traditional two-parent foster home with their maternal aunt, Latanique. The foster mother had her own children in the home, some of whom were over 13 years old, but appropriate background checks had been done for all residents of the household and there were no safety concerns.[9]

¶ 47    According to Robinson, all three children were attending school and doing well. T.M. and J.B. had individualized education plans (IEPs), the need for which was recognized and initiated by their foster mother. T.M. also attended a school program for social and emotional learning because he sometimes had problems with his peers, and J.B. attended weekly individual child therapy sessions to address the trauma from being in DCFS care, which caused her to act out in school.

¶ 48    According to Robinson, all three children had a loving bond with their foster mother, and she was willing to provide permanency for them by way of adoption. Robinson testified that she had made numerous unannounced visits to the family and that the interaction she observed between foster parents and children was appropriate. Robinson had observed the foster mother cooking while the children played outside and the entire family participating in family gatherings. The foster mother met the children's needs and gave them appropriate consequences. Robinson also noted that the foster mother had taken the children on trips, the last of which was to Niagara Falls. According to Robinson, all three children were in favor of adoption, particularly T.M., who was just "ready to have this be all over."

¶ 49    Robinson next testified about A.B.'s placement. A.B. (5 years old) was in a licensed single-

---

[9] The record reveals that Latinique has four biological children (ages 23, 20, 16, and 11, at the time of the termination hearing). It is unclear from the record, however, which of these children still reside with Latanique.

family foster home with her paternal grandmother, Lakita. There were no other children in the household. Robinson had observed a loving bond between A.B. and her grandmother and had no concerns regarding her ability to provide permanency in the form of adoption. A.B. was just starting kindergarten and had an IEP. The grandmother also facilitated visits with A.B.'s biological father, Jamez, which were infrequent.

¶ 50    On cross-examination, the respondent unsuccessfully attempted to elicit information from Robinson regarding why Latanique was not an appropriate foster parent for her three older children. The brunt of the respondent's questioning concerned her own childhood experiences with sexual abuse while living in Paula's home, and her allegation that Latanique, who was aware of this abuse, had now been "allowing people that were in [Paula's] house when she was abused to be around her children." Robinson, however, denied that Paula babysat the children and that the children were at any risk of harm in Latanique's home. In fact, she opined that Paula was irrelevant because the children were not placed with her.

¶ 51    On cross-examination, Robinson further averred that she was not aware that T.M. was found to be at risk of inappropriate touching in Latanique's home. Robinson also denied that J.B.'s hair was "pulled out and a bald spot was left in her head" and that "K.B.'s arm was broken in [Latanique's] home." Robinson explained that K.B. broke her arm while playing outside when she fell off the sliding board, and her case notes from December 2023 reveal that J.B.'s hair had come out after she had gone swimming because the chemical that had been placed in her weave, together with the chlorine, had irritated her scalp.

¶ 52    Upon further cross-examination, Robinson could not recall whether Latanique had been denied reimbursement from the State to pay for a door T.M. broke because of her inadequate supervision of the minor, or whether she had been marked unsatisfactory for medical and dental

appointments for J.B. and K.B.

¶ 53    In response to Robinson's testimony on cross-examination, the respondent published the following exhibits: (1) DCFS's 2018 Integrated Assessment report (the 2018 IA), which found that T.M. and K.B. were at a risk of harm in Latanique's home because Latanique had allowed Paula to babysit them while she was at work, even though Paula had been denied DCFS placement clearance because of prior "indicated allegations of abuse and neglect carrying a 50 year retention rate [which] occurred within [her] home in 1998," and recommended that DCFS "thoroughly assess" this area to "determine whether ongoing placement" with Latanique was appropriate; (2) an October 11, 2019, HCS mental health assessment for T.M., according to which T.M. was "at risk of being injured by a family member due to inappropriate behaviors (unwanted touching)"; and (3) DCFS's June 2023 family service plan according to which Latanique was marked "unsatisfactory" for failing to keep updated K.B.'s dental and vision exams, and J.B.'s medical and dental exams. The respondent also sought to publish an August 26, 2019, DCFS report, which she claimed showed that Latanique was "indicated" for "inadequate supervision" of T.M.[10]

¶ 54    After hearing all the evidence, the circuit court held that it was in the children's best interest that the respondent's parental rights be terminated. In doing so, the court explicitly noted that it had considered all of the respondent's exhibits but found that none of them rebutted the State's evidence. The respondent now appeals from the termination of her parental rights.

¶ 55                                            II. ANALYSIS

¶ 56    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) sets forth a two-step process for the termination of parental rights. *In re W.N.K.,* 2025 IL App (1st) 242008, ¶

---

[10] While the circuit court permitted the respondent to publish this report, we have been unable to find it among her exhibits or anywhere in the record below.

102; *In re C.W.,* 199 Ill. 2d 198, 210 (2002). First, the State must prove, by clear and convincing evidence, that the parent is unfit as defined in section 1(D) of the Illinois Adoption Act (Adoption Act) (750 ILCS 50/1(D) (West 2024)). *Id.*; see also 705 ILCS 405/2-29 (West 2024). Second, if the court finds that the parent is unfit, the State must prove by a preponderance of the evidence that it is in the children's best interests to terminate parental rights. 705 ILCS 405/2-29(2) (West 2024); *In re A.R.,* 2023 IL App (1st) 220700, ¶ 77.

¶ 57    We review both the circuit court's fitness and best interests' determinations under a manifest weight of the evidence standard. *In re W.N.K.,* 2025 IL App (1st) 242008, ¶ 102; *In re C.N.,* 196 Ill. 2d 181, 208 (2001); *In re C.E.,* 406 Ill. App.3d at 107-08. A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence. *In re M.J.,* 314 Ill. App. 3d 649, 655 (2000).

¶ 58                                    A. Parental Fitness

¶ 59    In the present case, the respondent first argues that the circuit court erred in finding that she was an unfit parent pursuant to subsections (b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2024). Because "[o]nly one of the grounds is necessary to prove that a parent is unfit" (*In re Tr. A.,* 2020 IL App (2d) 200225, ¶ 43; *In re Nicholas C.,* 2017 IL App (1st) 162101, ¶ 20), and we find it dispositive, we begin by addressing the court's unfitness finding under subsection (b) of the Adoption Act. 750 ILCS 50/1(D)(b) (West 2024).

¶ 60    Pursuant to this subsection, a parent may be found unfit if she "fail[s] to maintain a reasonable degree of interest, concern or responsibility" as to her children's welfare. *Id*. Our courts have repeatedly held that any of the three elements in this subsection (*i.e.* the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the children's welfare) can form

21

the basis for an unfitness finding. See *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; see also *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 90; *In re Jaron Z.,* 348 Ill. App. 3d 239, 259 (2004); *In re C.E.,* 406 Ill. App. 3d at 108. Each case concerning parental unfitness is *sui generis* and requires a close analysis of its unique facts. *In re C.E.,* 406 Ill. App. 3d at 108.

¶ 61  To determine whether a parent has shown a reasonable degree of interest, concern, or responsibility for her children's welfare, the circuit court "consider[s] a parent's efforts to visit and maintain contact with the child[ren], as well as other indicia of interest." *In re Daphnie E.,* 368 Ill. App. 3d 1052, 1064 (2006). In doing so, the court does not focus on the parent's success, but rather, the reasonableness of her efforts, taking into account her difficulties and circumstances. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 90; *In re Jaron Z.*, 348 Ill. App. 3d at 259; see also *In re Gwynne P.,* 346 Ill. App. 3d 584, 591 (2004), *aff'd* 215 Ill. 2d 340 (2005). Nonetheless, simply because a parent demonstrates some interest or affection toward her children does not render her fit. *Id*. Rather, her interest, concern, and/or responsibility must be reasonable. *Id*. "Noncompliance with an imposed service plan *** and infrequent or irregular visitation with the child[ren] have [both] *** been held to be sufficient evidence warranting a finding of unfitness under subsection (b)." *In re Jaron Z.*, 348 Ill. App. 3d at 259.

¶ 62  In the present case, after a thorough review of the record, we find that the circuit court properly concluded that the respondent was unfit because she failed to maintain a reasonable degree of interest, concern, or responsibility for her children. "This is a classic situation where the parent is subjectively interested in reunifying with her children but objectively displays unreasonable conduct in attempting to do so." *In re Nicholas C.,* 2017 IL App (1st) 162101, ¶ 28.

¶ 63  The record reflects that while the respondent loves her children and wants to visit them,

because of her own unaddressed mental illness, she cannot adequately assess their needs and put them before her own in a way that merits their return to her care as their parent. Specifically, the record reveals that throughout her adult life the respondent has struggled with her mental health and has been repeatedly psychiatrically hospitalized with symptoms of psychosis.[11] The last such hospitalization occurred in June 2022, when she was involuntarily admitted to Holy Cross Hospital after smashing windows in her apartment and threatening people in her building, whereupon she was described by hospital personnel as "acutely psychotic," a danger to herself and others, and needing restraint and sedation. The respondent's mental illness remains untreated, and as a result she is routinely unable to control her violent outbursts.

¶ 64    Consequently, the respondent has been unable to maintain regular visitation with her children during most of their time in foster care. In addition, the visits have frequently been limited because of concern for the children's safety, and the respondent has never achieved unsupervised visitation with any of them. In this respect, the record reveals that prior to J.B.'s birth, the respondent was permitted only supervised visitation with T.M. and K.B. but only sporadically visited them. After J.B. and A.B. were born, the respondent was allowed supervised visitation with all four children. However, after repeated violent outbursts in which she threatened to beat up service providers, and the October 2020 incident in which she stabbed a family member with a knife, the respondent's visits were suspended. By July 2021, the respondent was again participating in supervised visitation but only through video calls. These video calls, however, were terminated on March 19, 2022, after the respondent became verbally aggressive and

---

[11] It is impossible for us to specify the respondent's current diagnosis because of her refusal to submit to a current psychiatric/psychological evaluation. Her last diagnosis on November 1, 2022, was for PTSD, panic disorder, and major depressive disorder.

inappropriate with the foster parent in front of the children. Thereafter, the respondent had no visits with the children for a year. In-person supervised visits were reinstated in March 2023, then paused again during the respondent's June 2023 psychiatric hospitalization, but resumed the next month. On April 4, 2024, all visits were suspended after the respondent threatened and harassed DCFS case worker Irby upon learning that T.M. had not been allowed to keep a cell phone as a gift. Thereafter, the respondent was repeatedly told that to regain visitation she needed to be psychologically and psychiatrically evaluated. The respondent, however, refused to take part in any such evaluation.

¶ 65    The record further reflects that the respondent has failed to successfully complete the vast majority of reunification services required under her service plan. Since 2020, the respondent has been repeatedly assessed by two different agencies (Unity and DCFS) as needing the following services: individual therapy, domestic violence services, a substance abuse assessment, parenting classes, a psychological assessment, a psychiatric assessment, and a parenting capacity assessment. Over the years, to no avail, both agencies have referred the respondent to numerous services, which she has either refused or from which she has been discharged for belligerent and aggressive behavior. In the last six years, the respondent has completed only three parenting classes, two anger management courses, and a domestic violence class. On the other hand, she has refused to submit to psychiatric and psychological evaluations by any DCFS-accredited providers or to engage in any DCFS-approved individual therapy. While it appears that over the years, the respondent has attempted to engage in some self-referred mental health treatments, these have been sporadic and short-lived. Moreover, the respondent has consistently denied DCFS access to these providers such that the agency has been unable to review her progress. Accordingly, to this date, the respondent has failed to complete her psychological and psychiatric evaluations,

individual therapy, substance abuse assessment, and court ordered parenting capacity assessment, as required under her service plan.

¶ 66     Taken together, the respondent's continued mental health challenges, her limited visits with her children, and her unwillingness to comply with the recommended service plan, demonstrate her lack of interest, concern, and responsibility toward her children and support the circuit court's unfitness finding. See *In re Nicholas C.,* 2017 IL App (1st) 162101, ¶¶ 30-31 (holding that a mother's "refusal to participate in and complete her services, her lack of interaction with her service providers, *** and her failure to maintain a regular visitation with [her children] more than sufficiently demonstrated that she ha[d] not maintained a reasonable degree of responsibility toward their welfare"); *In re M.J.,* 314 Ill. App. 3d at 656-57 (affirming the circuit court's unfitness finding under subsection (b) of the Adoption Act despite the fact that the mother consistently attended scheduled visitations with her children because she failed to comply with the requirements of the service plan established by DCFS, including failing to obtain a drug and alcohol assessment and taking prescribed medications). Accordingly, under this record, we find nothing manifestly erroneous in the circuit court's conclusion that although the respondent clearly loved her children, her "consistent adversarial attitude" and "continuing mental health challenges" made it very difficult for her to prioritize her children and maintain a safe environment for them.

¶ 67     The respondent nonetheless asserts that the court manifestly erred when it found her unfit because the testimony of the three case workers regarding her failure to abide by the service plan was unreliable and inaccurate, since they could not recall many of the services she had completed, which were supported by final certificates of completion and introduced at the fitness hearing by way of her exhibits. We disagree.

¶ 68     It is axiomatic that because the circuit court has the best opportunity to observe the

demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight to be given to the witnesses' testimony. *In re D.D.*, 2020 IL App (4th) 220257, ¶ 28; *In re E.S.,* 324 Ill. App. 661, 667 (2001). Here, the circuit court gave credence to the testimony of the case workers regarding the respondent's consistent refusal to engage in any referred services. Any inability by the case workers to remember certain details regarding services completed by the respondent over a six-year period, without an opportunity to refresh their recollections, was occasioned by the *pro se* respondent's own inability to properly question them, and by no means renders their testimonies unreliable. What is more, where the DCFS service plans for those six years correctly list every DCFS-approved service that the respondent had engaged in, and the circuit court explicitly stated that it reviewed not only those service plans, but also all of the respondent's exhibits, including certificates of completion for those and other self-referred services, we see no reason whatsoever to doubt the court's credibility determination.

¶ 69    In a last-ditch effort to challenge the circuit court's unfitness finding, the respondent argues that before declaring her unfit, the circuit court should have *sua sponte* explored the erroneous reasons her children came into care in the first place. In this respect, she argues that her "entire multi-year case" involving all four children "was premised on faulty and unsubstantiated allegations regarding her second born [K.B.] being delivered drug-exposed" after which DCFS "took the reins, refusing to consider [her] point of view or involvement in finding opportunities and services to better herself."

¶ 70    At the outset, we note that the respondent's argument is forfeited. The respondent chose not to appeal the circuit court's 2018 adjudicatory and disposition orders regarding K.B. and therefore never challenged the basis for her removal from the respondent's care. Nor did she challenge the circuit court's adjudication and disposition orders with respect to T.M. and A.B.

Instead, she solely appealed the State's neglect finding and adjudication of wardship of J.B., which we affirmed below. *In re J.B.*, 2021 IL App (1st) 210098-U. The respondent's failure to file timely appeals challenging the reasons for the removal of her remaining children now forfeits her claim and we need not entertain it under the guise of a circuit court error.

¶ 71     Nonetheless, forfeiture aside, the respondent's contentions have no merit. Contrary to the respondent's position, from the State's petition for the adjudication of wardship of K.B., it is apparent that the State's primary safety concern for K.B. was not her exposure to drugs in utero, but rather the respondent's serious and untreated mental illness, which, at that time, had resulted in her hospitalization for suicidal ideation. The State's subsequent petitions for the adjudication of wardship for J.B. and A.B. similarly reveal that the State's primary concern remained the respondent's serious and untreated mental illness and not her continued substance abuse. Under this record, we find that the circuit court had no reason to *sua sponte* revisit the motive behind the State's original placement of the children into care, and that its failure to do so did not constitute error. This is particularly true where the court demonstrated that it was not afraid to use its *sua sponte* power to address and remedy other of the respondent's raised concerns by, midway through this case, replacing Unity with DCFS as the service provider.

¶ 72     Accordingly, because we find that the circuit court properly concluded that the respondent was an unfit parent pursuant to subsection (b) of the Adoption Act, we need not address the respondent's related argument regarding her unfitness pursuant to subsection (m). See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) ("When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court."). We therefore next address the circuit court's best interests finding.

¶ 73                                        B. Minors' Best Interests

¶ 74    The respondent contends that the circuit court's determination that it was in the minors'

best interests to terminate her parental rights was against the manifest weight of the evidence

because the children were placed in unsafe and inappropriate environments and the circuit court's

finding to the contrary was based on incomplete information. For the following reasons, we

disagree.

¶ 75    As already noted above, once the circuit court finds a parent unfit pursuant to the Adoption

Act, "the focus shifts to the child[ren]" and the court must decide whether it is in the children's

best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004); 705 ILCS

405/1-3(4.05) (West 2022); *In re Jaron Z.*, 348 Ill. App. 3d at 261. At this stage, the parent's

interest in maintaining a relationship with the child "must yield to the child's interest in a stable,

loving home life." *In re D.T.*, 212 Ill. 2d at 364. In deciding whether termination of parental rights

is in a child's best interests, the circuit court must consider the following statutory factors: (1) the

child's physical safety and welfare; (2) the development of the child's identity; (3) the child's

familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the

child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the

continuity of the child's relationships with parental figures, siblings, and other family members;

(8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and (10) the

preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024).

Additionally, the court may consider the nature and length of the child's relationship with his

present caretaker and the effect that a change in placement would have upon his emotional and

psychological well-being. *In re Jaron Z.*, 348 Ill. App. 3d at 262-63. In finding that it is in a child's

best interest that parental rights be terminated, the circuit court need not explicitly reference each

factor. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 76    In the present case, the record before us reveals that the statutory factors weigh heavily in favor of terminating the respondent's parental rights and placing the minors for adoption by their current foster parents. The children have been placed in their respective foster homes since the approximate commencement of each case. The three older children (T.M., K.B. and J.B.) reside with their maternal aunt, and the youngest (A.B.) resides with her paternal grandmother. DCFS caseworker Robinson described both placements as safe and appropriate. She further testified that the children had a loving bond with their respective foster parents and that the foster parents were committed to providing the minors with permanency through adoption. In addition, all the children's needs were being met, and they appeared well cared for and integrated into their respective foster families. In addition, T.M., K.B., and J.B. all told Robinson that they wished to be adopted, with T.M. reiterating that he cannot wait for all of this to "be over."

¶ 77    On the other hand, the record is devoid of any evidence that the minors could reasonably be returned to the respondent's home in the near future. Since the beginning of this case, over eight years ago, the respondent has repeatedly been given chances to participate in reunification services, and to address her mental health struggles, but has been unable to achieve the level of progress required to be permitted unsupervised visitation with her children. As such, under this record, we fail to see any error in the circuit court's determination that it is in the minors' best interests that the respondent's parental rights be terminated. See *In re Jaron Z.,* 384 Ill. App. 3d at 263-64.

¶ 78    The respondent nonetheless asserts that the circuit court's finding is against the manifest weight of the evidence because the record supports a conclusion that both foster homes are unsafe.

¶ 79    We begin by addressing the respondent's allegations regarding A.B.'s foster parent, Lakita. The respondent asserts that the State's evidence about A.B.'s placement with Lakita was "scant,"

and that she "attempt[ed] to elicit some testimony" that Jamez and his mother "antagoniz[ed] and tri[ed] to do very evil things to get her to react" so that they could "report it to DCFS."

¶ 80    The respondent's argument is without any merit. Contrary to the respondent's contention, Robinson provided detailed testimony about the appropriateness of Lakita's home and that testimony was supported by five years of DCFS biannual service plans for A.B., which were admitted into evidence. Together, both establish that A.B. was placed in Lakita's care almost immediately after her birth. Lakita was a licensed foster parent with no other children in her home and was willing to provide permanency for her granddaughter, A.B., by way of adoption. Over the years, Lakita had satisfactorily completed all health and developmental screenings for A.B. and had consistently made A.B. available for visits with both biological parents and her three siblings. Lakita had also enrolled A.B. in kindergarten and had ensured that A.B. was given an IEP. Most importantly, A.B. had a very loving and positive bond with her grandmother.

¶ 81    The respondent offered no evidence to the contrary. Instead, although she initially requested that A.B. be placed with Lakita and never questioned that placement until the best interests hearing, she now accused Jamez and his mother of colluding to trigger her to react in a manner that would result in her losing her parental rights. While the respondent claimed that she had recent text messages from Jamez that would prove this collusion, these messages were never introduced into evidence and are not part of the record on appeal. Moreover, even though the circuit court accepted the respondent's accusations as testimonial, as the trier of fact, it was well within its discretion to subsequently choose to give the respondent's testimony little weight or to entirely disregard it. Accordingly, because, aside from the respondent's bare accusations, the record before us contains no evidence whatsoever that Lakita did anything to antagonize the respondent or that she was in any way inappropriate or unsafe with A.B., we find that the circuit

courts best interests' determination with respect to A.B. was not manifestly erroneous.

¶ 82    We next address the respondent's arguments regarding Latanique. The respondent appears to argue that Latanique's home is unsafe for her three older children (T.M., K.B. and J.B.) because Latanique permits them to have contact with her mother, Paula, in whose care the respondent herself experienced sexual abuse as a child. In support, the respondent appears to rely on: (1) the 2018 IA, which, at that time, found T.M. and K.B. were at a risk of harm because Latanique had used Paula as a babysitter when she went to work; and (2) the October 11, 2019, HCS mental health assessment for T.M., which states that he is "at risk of being injured by a family member due to inappropriate behaviors (unwanted touching)."

¶ 83    Contrary to the respondent's position, however, apart from her own bare and unsubstantiated allegations, nothing in the record even remotely suggests that since 2018, Paula has continued to babysit any of the children or even been present in Latanique's home. In fact, Robinson testified that Paula is not the children's babysitter. Moreover, after the 2018 IA urged the placement agency to "thoroughly assess" the risk of harm to T.M. and K.B. stemming from Latanique using Paula as their caregiver to "determine whether [their] ongoing placement" with Latanique was appropriate, over the next seven years, two separate agencies (Unity and DCFS) have repeatedly evaluated Latanique and have found her to be both a safe and appropriate foster parent.

¶ 84    On the other hand, the record shows that respondent has continued to channel her own traumatic childhood experiences with Paula into animosity toward Latanique. Over the years, she has sent Latanique threatening messages, repeatedly made false claims against her to the DCFS Hotline, and been disruptive and inappropriate with her during supervised visitation with the children.

¶ 85    While we by no means mean to diminish the respondent's traumatic childhood experiences or her anxiety over her children being taken care of by Paula, whose neglect resulted in the her own abuse, based on the record before us and the lack of any evidence therein to suggest that Paula spends any time with her children, we are unable to conclude that Latanique's home is presently unsafe for the three minors.

¶ 86    The respondent's reliance on the 2019 HCS mental health assessment of T.M. is similarly unavailing. While the assessment states that T.M. is "at a risk of being injured by a family member due to inappropriate behaviors (unwanted touching)," this statement is taken out of context. When read in its entirety, it becomes clear that the unwanted touching refers to T.M.'s excessive touching/hitting of other children at home and in school, which have impacted his relationship with family members and neighbors, and for which he has been ostracized by his peers. According to the assessment, T.M.'s "decisions have not been consistently in the best interest of his own safety,"  because he "steals from family members," "has space proximity issues," and does not recognize his own inappropriate conduct. Treatment goals are therefore set as teaching T.M. better "communication, decision-making, [and] age-appropriate social skills."

¶ 87    Under this record, nothing in the HCS assessment compels us to reject the circuit court's finding that Latanique's home was appropriate. In this respect, we also reiterate that both the 2019 HCS assessment and Robinson's testimony reveal that T.M. enjoys living with Latanique and wishes to continue living with her.

¶ 88    Ultimately, the record here establishes that the circuit court's decision to terminate the respondent's parental rights was not contrary to the manifest weight of the evidence. Instead, from all that was presented, we find ample evidence supporting its finding that it was in the best interests of all four children. Accordingly, we find no error on part of the circuit court.

¶ 89                              III. CONCLUSION

¶ 90     For these reasons, we affirm the judgment of the circuit court.

¶ 91     Affirmed.